Mary J. McCarthy, Appellant, v. Sara G. Moore, Defendant, Impleaded with The People of the State of New York, Respondent.   (Action No. 1.)

Mary J. McCarthy, Appellant, v. Isaac R. Fish and Others, Defendants, Impleaded with The People of the State of New York, Respondent.   (Action No. 2.)

Third Department, January 6, 1926.

Taxation — tax sales — 300 acres of land in Forest Preserve were offered for sale by Comptroller at public auction in 1877 under Laws of 1855, chap. 427 — 100 acres only were bid in — bidder failed to pay — subsequently in 1881 deed was made to State for 300 acres — Comptroller under Laws of 1855, chap. 427, could give deed to State for 100 acres only — remaining 200 acres were free from tax lien — Laws of 1878, chap. 152, authorizing State to transfer all land liable to sale was not retroactive — Laws of 1896, chap. 908, § 132, providing " every such conveyance " by Comptroller shall, after two years' record, be conclusive that sale was regular, does not apply to 200 acres that were not sold — said statute does not limit action except as to° causes stated therein — no limitation on ground that sale was never made — Laws of 1920, chap. 854, requiring owner of land listed on State land list to file statement within six months after act became effective or be barred, is unconstitutional — subsequent sales to State without competition are invalid.·

The State Comptroller, who in 1877 offered for sale for unpaid taxes 300 acres of land in the Forest Preserve, of which 100 acres only were bid in, did not have the right under chapter 427 of the Laws of 1855 in force at the time the sale was made, to make a deed of the entire 300 acres to the State on the failure of the bidder to comply with his bid, for under that statute the Comptroller had the right only to transfer the amount of land actually bid in and the amount not so bid in became free from the tax lien.

Chapter 152 of the Laws of 1878, which became effective after the sale in question and which authorized the Comptroller to convey to the State the whole quantity of land liable to sale, did not apply to this sale, since that act was not retroactive and, therefore, the deed made in 1881 cannot be held valid by force of that act.

The provision in section 132 of chapter 908 of the Laws of 1896 to the effect that " every such conveyance " theretofore executed by the Comptroller which had for two years been recorded in the office of the clerk of the county in which the lands conveyed thereby are located shall be conclusive evidence that the sale and proceedings prior thereto were regular, does not apply as to the 200 acres that were not sold at the tax sale in 1877, for that statute applies only in case a sale has actually been made, which is not true as to the 200 acres in question.

The limitation in said section 132 of chapter 908 of the Laws of 1896, which provides for the institution of proceedings to test the validity of conveyances upon specified grounds does not apply in this case, since the validity of the conveyance is attacked on the ground that no sale was made which is a ground not specified in the act.

7

Chapter 854 of the Laws of 1920, requiring the owner of land situated in the
Forest Preserve and listed on the State land list, who claims to hold the land
adversely to the State, to file within six months after the act takes effect a
statement describing the land claimed and setting forth his claim of title or
forever be barred from maintaining an action to recover it, is unconstitutional.

Conveyances made by the Comptroller to the People of the State upon tax sales
subsequent to that of 1877 were invalid, since at such sales the lands were
struck down to the State without opportunity given to any person to make a bid.

APPEAL in each of the above-entitled actions by the plaintiff,
Mary J. McCarthy, from a judgment of the Supreme Court in
favor of the respondent in each action, entered in the office of
the clerk of the county of Warren on the 17th day of April, 1925,
upon the decision of the court rendered after a trial at the Sche-
nectady Special Term.

The opinion of the Special Term is reported in *McCarthy* v.
*Moore, No. 1* (125 Misc. 453).

*William T. Moore,* for the appellant.

*Albert Ottinger, Attorney-General [Eric J. Lake, Deputy Attorney-
General,* of counsel], for the respondent.

H. T. KELLOGG, J.   These actions were brought for the partition
of lands in lot 18, township 24, Totten and Crossfield's Purchase,
in the town of Chester, Warren county.   The first action relates
to all of the north half of the lot, or about two hundred and ten
acres, while the second action relates to about ninety acres in the
north part of the south half.   In the year 1868 John W. Cady
owned the north half of the lot, while Isaac Fish owned the south
half.   The individual parties to the first action claim the entire
title to the north half through mesne conveyances from Cady.
The individual parties to the second action claim the entire title
to the ninety acres of the south half through mesne conveyances
from Fish.   In each action the People of the State of New York
claim exclusive title to the lands involved.   This claim is founded
upon a tax deed from the Comptroller to the People which is dated
April 30, 1881, and was recorded in Warren county clerk's office
on July 1, 1882.   The deed was based upon a tax sale of the year
1877, had for the collection of unpaid taxes levied in the year 1868.

The assessment roll of the town of Chester for the year 1868
showed two assessments against lot 18, township 24, Totten and
Crossfield's Purchase.   One assessment was " non-resident," and
was made against " 300 " acres " N. part No. 18."   The other
assessment was to Isaac Fish and was against " 200 " acres " No.
18 S. P."   As the north half of the lot contained not to exceed
210 acres, at least 90 acres in the north part of the south half was
subjected to a double assessment.   The trial court has found,

and it seems not to be disputed, that this fact rendered both assessments illegal. On October 9, 1877, the Comptroller, at public auction, offered for sale the lands described in the first assessment, or 300 acres in the north part of lot 18. One Hansee made a bid equaling the amount of the tax for 100 acres of the property so offered, and that acreage was struck down to him. Hansee did not pay his bid. On October 18, 1877, the Comptroller executed a certificate of sale. The certificate was originally written to read that the State " per Jesse C. Hansee purchased 100 acres of land situate in the County of Warren to be laid out   *   *   * in the form of a parallelogram, as near as may be across the north end of the following lot or parcel, viz. Tottens & Crossfield's Purchase, Township 24, Lot 18, N. Pt. 300 acres." It had, by erasure and interlineation been made to read that the State " per Chap. 427, Laws of 1855, as amended by Chap. 152, Laws of 1878, Sec. 48 " had purchased " Lot 18, N. pt. 300 acres." Self-evidently, the certificate, if not altered after delivery, must have been issued in the year 1878, after the passage of chapter 152 of the laws of that year. The subsequent deed of the Comptroller to the State, executed on April 30, 1881, was made in conformity with the corrected certificate and purported to convey the entire 300 acres to the State.

Chapter 427 of the Laws of 1855, so far as its provisions are pertinent upon this issue, was in full force at the time of the sale of 1877. Section 45 of that act provided that if a purchaser at a tax sale neglected to pay his bid within forty-eight hours after the last day of the sale, the Attorney-General might institute suit to recover the amount thereof, or the Comptroller might, in his discretion, " re-sell the said lands upon which such bids so remaining unpaid were made, as hereinafter provided." Section 47 provided that if the purchaser, after the expiration of three months from the conclusion of the sale, had not paid his bid, the Comptroller might cancel the sale and extinguish the rights of the purchaser. Section 48 provided as follows: " When the Comptroller shall have cancelled any sale in the manner above provided, he may issue a certificate of such sale to any other person who will pay the amount for such certificate which would be payable by the original purchaser, in case the said sale had not been cancelled, or if such certificate cannot be sold, he may transfer the same to the People of the State." Thus, in the event of cancellation, the Comptroller might resell " the said lands upon which such bids so remaining unpaid were made." The resale after cancellation of " any sale," was to be made by issuing a certificate " of such sale " to any person who would pay the amount of the original bid, or, if the

certificate of such sale could not be sold, the Comptroller might transfer the same to the People of the State. It will be seen that, under the act of 1855 the Comptroller's sphere of action, subsequently to the acceptance of any bid made at the sale, was confined exclusively to the premises which were the subject of the original bid and its acceptance.

Chapter 152 of the Laws of 1878 materially altered the provisions of chapter 427 of the Laws of 1855, above referred to. Section 48 of the act of 1855 was re-enacted with changed phraseology but in identical terms, with the exception that the following material provision was appended thereto: " but in all cases where the People of the State becoming the purchasers by such transfer, the whole quantity of land liable to sale for the purchase-money mentioned in such certificate shall be covered by such purchase, the same as if no person had offered to bid therefor at the sale." This act became effective on April 20, 1878. In the case at bar the sale took place on October 9, 1877, or six months earlier than the date of the new enactment. On the latter date the rights of the owners of the 200 unsold acres in the north part of lot 18, township 24, had become definitely fixed and determined. The 200 acres had become free from the lien of any tax levied for the year 1868 as fully and completely as as if the tax had been paid. After that date the sole remedy of the State was to collect the tax by prosecuting the bidder or by pursuing its remedy of resale against the 100 acres struck down to the bidder. It could pursue no remedy against any other land or any other person. The owners of the remaining 200 acres could, so far as any tax incumbrance was concerned, transfer a perfect title to the same. The respondent, in its brief, practically concedes this, for therein it says: " The result, had it not been for a special amendment to the Tax Law, would have been that two hundred of the three hundred acres would have been freed from the tax and the State would have been forced to take the remaining one hundred to satisfy the same." The " special amendment " referred to is that provision of chapter 152 of the Laws of 1878 which we have quoted. It is self-evident that, if the act of 1878 was intended to be retroactive, it offended against the due process clause of the Constitution. It would not have supplied a remedy to collect a tax, for a tax no longer obtained. Rather, it would have imposed a tax arbitrarily without regard to any system designed to effectuate an equal distribution of the burden of taxation. It would arbitrarily have deprived the owners of the 200 acres of their property rights. It cannot be supposed that the Legislature of the State intended to pass an unconstitutional act. That the act of 1878 must be construed to have had

a prospective operation only is well settled by the authorities. (*People ex rel. Newcomb* v. *McCall*, 94 N. Y. 587; *Jacobus* v. *Colgate*, 217 id. 235; *Draper* v. *Draper & Sons*, 201 App. Div. 770.) We hold that the act of 1878 did not apply, and that no sale, legal or otherwise, of the 200 acres was ever made to the State or to any other person by authority of the State.

It is contended that the provisions of section 132 of chapter 908 of the Laws of 1896, being the Tax Law of 1896, apply to make unassailable the Comptroller's conveyance to the People of the State. That section in part provides: " Every such conveyance heretofore executed by the Comptroller * * * and all conveyances of the same lands by his grantee or grantees therein named, which have for two years been recorded in the office of the clerk of the county in which the lands conveyed thereby are located * * * shall be conclusive evidence that the sale and proceedings prior thereto * * * were regular * * *." (See, also, Tax Law of 1909, § 132.) To determine the meaning of the words " every such conveyance " reference must be had to the sections of the Tax Law which precede section 132. It will be found that the sole conveyance by the Comptroller, which is the subject of any prior provision, is a conveyance made by him in consummation of an actual sale at public auction. Moreover, the quoted provision itself makes a record of a conveyance, after two years, conclusive proof that " the sale and proceedings prior thereto " were regular. Clearly if there has been no sale by the Comptroller the provisions of section 132 do not attach. It has been uniformly held that, where lands are put up for sale by the Comptroller and struck down to the State without allowing opportunity for bids to be made, the sale is wholly illegal. (*Saranac L. & T. Co.* v. *Roberts*, 195 N. Y. 303, 312; *People* v. *Inman*, 197 id. 200, 205.) In the *Inman* case it was said: " But if, on the contrary, the first deed transferred no title to the State, the subsequent sales were void because of the withdrawal of the lands from public competition." In the case at bar, as already shown, there never was any sale of the 200 acres, so that there was never a Comptroller's conveyance which, under section 132 of the Tax Law, could be presumed to be regular.

It will be observed that the provisions of section 132 of the Tax Law of 1896, in so far as they relate to conveyances by the Comptroller, which, at the time of the enactment, had been recorded for two years, make all such conveyances conclusively regular with stated exceptions of a limited nature. These exceptions provide for the institution of proceedings or the bringing of actions to test the validity of conveyances upon specified grounds. Again, the institution of

the proceedings or the actions is limited to the period of one year from the passage of the act. Generally, then, the section is a retroactive enactment of a curative character. Specially, and to the extent only of the remedies bestowed, it is a Statute of Limitations. If the taxpayer cannot attack the conveyance upon the grounds specified, then as to him the statute is effective, if at all, purely as a curative enactment. In *Wallace* v. *McEchron* (176 N. Y. 424, 429) Judge CULLEN, restating the provisions of the act, named, as the sole grounds of permitted attack upon Comptrollers' conveyances, the following: " 1. That the taxes have been paid; 2. That the town or ward had no legal right to assess the land; 3. A defect affecting the proceeding on constitutional grounds." In that case the taxpayer had obtained from the Comptroller a statement of taxes against her land which she thereupon paid. The land was afterwards sold for a tax not mentioned in the statement. It was held that her cause of complaint was not within the exceptions; that as to her the enactment was not a Statute of Limitations; that as a curative enactment the statute was not effective, since the sale and conveyance were invalid upon jurisdictional grounds. In the case at bar the complaint of the landowners was and is that there was no sale of the premises, legal or otherwise, and that the Comptroller's conveyance, was, therefore, unauthorized. No such ground of attack is recognized by the section. Therefore, as to them, the section did not impose a limitation upon a right of action. Regarded as a curative enactment the section did not apply since the defects were jurisdictional. (*Joslyn* v. *Rockwell*, 128 N. Y. 334; *Wallace* v. *McEchron, supra.*) For these reasons, in addition to the reasons heretofore given, the section cannot aid the respondent.

The respondent further contends that the individual parties to the actions are barred from claiming title to the land in question by reason of their failure to file statements describing the lands claimed and setting forth their claims of title as provided in chapter 854 of the Laws of 1920. That act is entitled: " An act to provide for the appointment of a commission to investigate the matter of titles to lands claimed adversely to the State in counties containing portions of the Forest Preserve, and to report its proceedings together with its recommendations in relation thereto to the Legislature." It creates a commission to investigate the title to lands in counties containing portions of the Forest Preserve. It provides that it shall have power to examine witnesses in the matter of disputed titles; to compel the production before it of public records; to subpœna witnesses and require their attendance before it. It provides that the evidence taken by the commission shall be filed

in the office of the Secretary of State, and that such evidence may be received as proof in any subsequent action or proceedings involving title to any real estate concerning which the evidence may be material. It contains the following section 4: " In all cases where lands described upon the State land list in the custody of the Comptroller are held or claimed adversely to the State the adverse claimant shall, within six months after this act shall take effect, file with said commission a statement describing the land claimed and setting forth his claim of title. Should such claimant fail to file such statement within the time limited as aforesaid, he shall be forever barred from maintaining an action against the People with relation thereto or from interposing his said claim of title as a defense to any action or proceeding brought by the People to recover the possession thereof." The provisions of this extraordinary section are wholly extraneous to the purposes of the act as announced by its title and entirely unrelated to the subject-matter covered by other sections of the statute. Yet the provisions have the widest scope and the greatest importance. Every claimant of lands " held or claimed " adversely to the State, if the lands are described upon the State land list kept by the Comptroller, must within six months file a statement with the commission, describing the same and his claim thereto. Otherwise, he is forever barred from suing the State therefor or from defending against the State in an action brought by it to recover the same. It matters not that he may be the undisputed owner having actual possession. It matters only that his lands are named on the State land list kept by the Comptroller. Yet the State land list has no sanction in statute. No law requires that it shall be kept, or prescribes what shall be entered thereupon. At the moment when the statute became a law, the Comptroller might already have entered upon the list every parcel of land in the State of New York. The law did not forbid it. Or he might have placed thereon the lands of none others than those against whom he held a personal grievance. The law did not forbid it. On the other hand, it is highly probable that the lands of many legal owners in actual possession were in fact described upon the list. We have not been informed to the contrary. Indeed, we have no knowledge as to the contents of the list except that the lands now in suit had been entered thereupon. The constitutionality of a law must be judged not by what it did accomplish in any given instance, but by the results which might have followed from its enactment. We think that the section in question might have resulted, and was designed to result, in arbitrarily depriving the true owner, having actual possession, of his title to real property

and its possession. It might so have resulted without notice to the owner that his lands were claimed by the State so that he might take the necessary steps to prevent the untoward result, since no statute made the State land list a public document or required the Comptroller either to give notice of its contents or to exhibit the same to any landowner. So far as we are informed the statute has never yet been interpreted. We can cite opinions and suggestions which have been offered in reference to the constitutionality of certain statutes of limitations, the effect of which might have been closely analogous. It has been said of such a statute: " It is claimed that one in possession of all his rights cannot be compelled to resort to legal proceedings or else run the risk of losing them. * * * There is very weighty authority for holding such a statute in the case of one in possession to be invalid." (Per Peckham, J., in *Joslyn* v. *Rockwell, supra.*) Again, " It is questionable whether as to an owner in actual possession of land the record of a hostile conveyance in the clerk's office is sufficient to set a Statute of Limitations running against him so as to destroy his title." (Per Cullen, J., in *Meigs* v. *Roberts*, 162 N. Y. 371.) In *People* v. *Ladew* (189 N. Y. 355, 360) Judge Willard Bartlett alludes to these expressions, and says: " The same doubt was expressed by Judge Peckham in *Joslyn* v. *Rockwell* (128 N. Y. 334) in language which conveys the impression that if the learned judge had been required then to solve that doubt he would have held that the conveyance was ineffective." In *People* v. *Ladew* (237 N. Y. 413, 427) it was said by Andrews, J.: " This is far from the proposition that one actually in possession of the land, not disturbed in any way, with no act of ouster by the State, by the mere insertion of an advertisement that he may never see, loses in law the possession which in fact he still has — that to avoid subsequent ejection he may be compelled to defend his possession as to which there has been no interference." Judge Cooley has said: " Limitation laws cannot compel a resort to legal proceedings by one who is already in the complete enjoyment of all he claims." (Cooley Const. Lim. [7th ed.] chap. XI, p. 523.) If an owner in possession cannot constitutionally be compelled to institute legal proceedings within a given time under penalty of losing his title, it must follow that such an owner cannot constitutionally be compelled to file a claim with administrative officers of the State or thereafter be debarred, in prosecution or in defense of an action, from asserting his title. That such might have been the result under the statute in question we have already shown. Moreover, the owner might so have been debarred without any notice whatever, statutory or otherwise, of any claim made by

the State. There is authority for the view that an owner should not be required to search the Comptroller's office to discover an adverse claim. Thus it was said by CULLEN, Ch. J., in *Bryan* v. *McGurk* (200 N. Y. 332, 339): " It is going quite far enough to require the landowner to keep track of any conveyance, in the office of the clerk of the county where his land is situated, in derogation of his title. To require him to examine every conveyance which may be noted in the Comptroller's office seems to me quite unreasonable." It would be especially unreasonable to require him to take notice of the contents of a land list which the Comptroller might or might not, at his pleasure, exhibit to him. For all these reasons we think that the provisions of chapter 854 of the Laws of 1920 have no legal force to bar the individual parties to these actions from asserting their title to the lands in suit.

The conveyances made by the Comptroller to the People of the State upon tax sales subsequent to that of the year 1877 need not be discussed, since at such sales the lands were struck down to the State without opportunity given to any person to make a bid. Such conveyances, for reasons already stated, were invalid, and could not be validated by any curative statute or Statute of Limitations.

The judgment in each case should be reversed on the law and facts, with costs against the respondent, and judgment directed in each case in favor of the plaintiff for partition of the lands in suit among the individual parties to the action.

All concur.

Judgment reversed on the law and facts, with costs, and judgment directed in favor of the plaintiff for partition of the lands in suit among the individual parties to the action, with costs.

The court disapproves of findings of fact numbered five, six, seven, eight, ten, eleven, fifteen and nineteen, and the facts found in the conclusions of law numbered one and two. It finds the facts stated in plaintiff's requests to find numbered ten, eleven, thirteen, fourteen and seventeen, and his conclusions of law requested numbered twelve, fourteen, fifteen, sixteen and seventeen.

On January 15, 1926, the decision in this case was amended to read as follows:

Judgment in each case reversed on the law and facts, with costs against the respondent, and judgment directed in each case in favor of the plaintiff for partition of the lands in suit among the individual parties to the action.

The court disapproves of findings of fact numbered four, five, six, seven, eight, eleven, fifteen and nineteen in action No. 1,

and the facts stated in conclusions of law numbered one and two in said action, and it finds facts stated in plaintiff's requests to find, in said action, numbered ten, eleven, thirteen, fourteen and seventeen, and the facts stated in plaintiff's requested conclusions of law, in said action, numbered three, five, fourteen, fifteen, sixteen and seventeen, and further finds that the people of the State of New York have no right, title, claim, interest or lien in, to or on said lot eighteen or any part thereof for the alleged unpaid taxes, for the non-payment of which the sale of said lot in the year 1877 was had, nor by reason of the deeds given upon the sales held in the years 1877, 1881 and 1885.

The court disapproves of findings of fact numbered four, five, seven, eight, eleven, sixteen and nineteen, in action No. 2, and the facts stated in conclusions of law numbered one and two in said action, and it finds the facts stated in plaintiff's requests to find, in said action, numbered five, six, seven, nine, ten and thirteen, and the facts stated in plaintiff's requested conclusions of law, in said action, numbered six, seven, eight, nine, ten, eleven and twelve.