Argued June 21, affirmed July 12, argued on rehearing December 6, 1927, reversed February 14, 1928.

# EASTERN & WESTERN LUMBER CO. ET AL. *v.* ISAAC L. PATTERSON, GOVERNOR, ET AL.

### (258 Pac. 193; 264 Pac. 441.)

**Constitutional Law—Only Persons Who may be Injured by Operation of Statute may Question Its Validity.**

1. Constitutionality of law will not be adjudged when party asserting invalidity has no interest therein and question is merely academic, since only persons who may be injured by its operation may question its validity.

**Constitutional Law—Lumber Companies Held Proper Parties to Question Validity of Statute Authorizing Use of State Industrial Accident Fund for Construction of State Office Building (Laws 1927, p. 413; Workmen's Compensation Law).**

2. Lumber companies *held* proper parties to question validity of Laws of 1927, page 413, authorizing use of state industrial accident fund for construction of state office building, since such fund consists largely of contributions of employers in nature of insurance premiums exacted by provisions of Workmen's Compensation Law (Or. L., § 6605 et seq.).

**Constitutional Law—Statute is Presumed Valid.**

3. In considering validity of statute, court commences with presumption that statute is valid, and such presumption prevails until overcome.

**Constitutional Law—Court will Resolve All Doubts in Favor of Constitutionality of Statute, and will Adopt Construction Rendering It Constitutional Rather Than One Rendering It Invalid.**

4. In determining validity of statute, courts will resolve all doubts in favor of constitutionality, and, if enactment is reasonably susceptible of two constructions, only one of which would render it constitutional, such construction will prevail.

**Constitutional Law—Invalidity of Statute must be Shown Beyond Reasonable Doubt.**

5. Courts in determining validity of legislative act will not declare it void unless nullity and invalidity are shown, in their judgment, beyond reasonable doubt.

1. Who may raise objection to constitutionality of statute, see notes in 19 Ann. Cas. 175; Ann. Cas. 1915C, 57. See, also, 6 R. C. L. 89–91.
3. See 6 R. C. L. 98; 25 R. C. L. 1000.
4. See 6 R. C. L. 78, 97; 25 R. C. L. 999, 1000.
5. See 6 R. C. L. 98; 25 R. C. L. 1000.

**Constitutional Law—Exercise of Power to Hold Law Unconstitutional is Ultimate and Supreme Function of Courts.**

6. Exercise of power to hold law invalid because of conflict with Constitution is ultimate and supreme function of courts.

**Constitutional Law—Decision as to Validity of Statute must be Predicated on Terms Thereof and by What It Authorizes.**

7. In determining validity of statute, decision must be predicated on terms thereof and by what it authorizes, and not by what has been done or probably will be done thereunder.

**Evidence—Statute's Invalidity may be Shown by Things Judicially Noticed or Facts Established by Evidence.**

8. Invalidity of statute may be shown by things which will be judicially noticed or by facts established by evidence.

**Constitutional Law—Attacking Party must Establish Invalidity of Statute.**

9. In proceeding to determine validity of statute, burden is on attacking party to establish invalidating facts.

**Constitutional Law—Legislature may Enact Any Law not Forbidden by Fundamental Law of State or Federal Government.**

10. Legislative assembly may enact any law not forbidden by fundamental law of state or federal government, since state Constitution is not grant but limitation of power.

**Constitutional Law—In Adjudging Validity of Statute, Court cannot Consider Desirability, Expediency, Policy, Justice or Wisdom of Its Enactment (Const., Art. III).**

11. In adjudging validity of statute, court is not privileged to consider desirability, expediency, policy, justice or wisdom of its enactment, in view of Constitution, Article III, prescribing functions of the several departments of government and forbidding encroachment of one department on powers of another.

**States—Statute Providing for Investment of Industrial Accident Fund in Office Building for State, Providing for Interest and Appropriation of $60,000 Annually from General Fund for Repayment, Held Invalid as Creating Excessive Debt—"Invest" (Laws of 1927, pp. 413, 523; Const., Art. XI, § 7).**

12. Laws of 1927, page 413, providing for investment, in office building for state, of industrial accident fund, providing for payment of specified rate of interest and appropriation of $60,000 annually from general fund of state for repayment, *held* invalid

---

6. Power of courts to declare an act of the legislature unconstitutional, see note in 17 L. R. A. 838. See, also, 6 R. C. L. 70.

7. See 6 R. C. L. 82; 25 R. C. L. 809.

8. See 6 R. C. L. 115.

10. See 25 R. C. L. 806.

11. Judicial inquiry into wisdom, policy, or motives prompting enactment of statute, see notes in 1 Ann. Cas. 570; Ann. Cas. 1912A, 716; Ann. Cas. 1917B, 834. See, also, 6 R. C. L. 107; 25 R. C. L. 808.

as violating Constitution, Article XI, Section 7, by creating debt in excess of $50,000, notwithstanding Laws of 1927, page 523, providing for payment into general fund of rentals collected from state boards and commissions; "invest" meaning application of money in property from which interest or profit is expected, in which case title and control of property remain with investor, though specific character has changed.

**Evidence—Court will Take Judicial Knowledge of Results of Constitutional Limitation on State Revenues (Or. L., § 729, subds. 3, 8).**

13. Court will take judicial knowledge of results of constitutional limitation on state revenues, in that Governor was compelled to veto bills for capital investment in new buildings, which still left deficiency, in view of Section 729, subdivisions 3, 8, Or. L.

**Statutes—Act Authorizing Use of State Industrial Accident Fund for Construction of State Office Building Held Invalid in Entirety Because of Invalid Provision Creating Excessive Debt (Laws 1927, p. 413; Const., Art. XI, § 7).**

14. Laws of 1927, page 413, providing for investment of state industrial accident fund in office building for state, providing for payment of specified rate of interest, and appropriating money from general fund for repayment of principal and interest, *held* void in its entirety because of invalidity of provision creating debt in excess of that prescribed by Constitution, Article XI, Section 7, since, where striking of obnoxious section would cause results not contemplated or desired by legislature, entire statute must be held inoperative.

## ON REHEARING.

**States—Statute Authorizing Investment of $600,000 of Industrial Accident Fund in Office Building Held not Invalid as Creating Excessive "Debt"—"Debtors"—"Creditors" (Laws 1927, p. 413; Const., Art. XI, § 7).**

15. Laws of 1927, page 413, authorizing investment of $600,000 of industrial accident fund in construction of office building for state and providing in Section 6 for use of annual sum for repayment and refund is not invalid as creating excessive debt under Constitution, Article XI, Section 7, providing that legislature shall not create debt in excess of $50,000, since state is absolute owner of industrial accident fund, and hence no debt arises; departments, bureaus and commissions not being personages to extent that they can be "debtors" or "creditors," in view of laws.

**States—Statute Authorizing Investment of $600,000 of Industrial Accident Fund in State Office Building Held not Invalid as Creating Excessive Debt Even if Fund is Trust Fund (Const., Art. XI, § 7; Laws 1927, p. 413).**

16. Laws of 1927, page 413, authorizing investment of $600,000 of industrial accident fund in office building for state, and providing in Section 6 for use of annual sum for repayment and

---

13. Judicial notice, see notes in 89 Am. Dec. 663; 124 Am. St. Rep. 22. See, also, 15 R. C. L. 1056.

refund, is not invalid as violating Constitution, Article XI, Section 7, providing that legislature shall not incur debt in excess of $50,000, assuming that such fund is a trust fund and not absolute property of state, in view of Laws of 1927, pages 74, 523.

**Constitutional Law—Law Susceptible of Different Construction Should be Construed to be Valid.**

17. Where act is susceptible to more than one construction one of which renders it invalid as violating Constitution and the other of which accords with Constitution, the latter should be preferred where it does no violence to reason or justice.

**Constitutional Law—Proof That Act is Unconstitutional must be Highly Persuasive.**

18. Proof that act is invalid by reason of conflict with Constitution must be highly persuasive.

Constitutional Law, 12 C. J., p. 745, n. 1, 2, p. 746, n. 3, p. 748, n. 9, 10, p. 753, n. 50, p. 760, n. 57, p. 762, n. 62, p. 763, n. 68, p. 775, n. 42, p. 780, n. 98, p. 786, n. 79, p. 787, n. 89, 93, 96, p. 788, n. 1, p. 791, n. 19, p. 794, n. 20, p. 795, n. 27, p. 797, n. 34, p. 802, n. 94, p. 805, n. 46.

Debt, 17 C. J., p. 1371, n. 29.
Eminent Domain, 20 C. J., p. 833, n. 48.
Interest, 33 C. J., p. 178, n. 1.
Invest, 33 C. J., p. 807, n. 52, 53, 56, 62.
States, 36 Cyc., p. 870, n. 66, p. 883, n. 27, p. 884, n. 35, 39, p. 885, n. 43, p. 889, n. 85, p. 890, n. 92.
Statutes, 36 Cyc., p. 977, n. 28, p. 978, n. 29, p. 1111, n. 67, p. 1114, n. 96.
Workmen's Compensation Acts, C. J., p. 6, n. 24, p. 7, n. 32, p. 9, n. 38, p. 15, n. 11, p. 146, n. 67.

From Marion: L. H. McMAHAN, Judge.

In Banc.

This proceeding is prosecuted to test the validity of Chapter 322, General Laws of Oregon, 1927, authorizing the use of the state industrial accident fund for the construction of a state office building. The act is entitled:

"An Act providing for the construction of an office building for the state of Oregon and the investment of part of the industrial accident fund for that pur-

17. See 6 R. C. L. 78, 97; 25 R. C. L. 999, 1000.
18. When statute will be declared void as conflicting with Constitution, see note in 48 Am. St. Rep. 269.

pose, and for the security of said fund, and declaring an emergency.''

Section 1 of the act empowers and directs the state board of control to construct, in Salem, Oregon, an office building for the state, and to invest in such building the state industrial accident fund in an amount not exceeding $600,000. Section 2 provides for the creation of a state office building fund from the sale of bonds in which the industrial accident funds may be invested, and from other uninvested parts of the industrial accident fund, and appropriates this fund, which shall not exceed the sum of $600,000, for the purpose of constructing the above-mentioned office building to be used by the various departments of the State of Oregon. Section 3 directs the secretary of state to audit all approved claims incurred in pursuance of law and the foregoing appropriation, and to draw his warrant upon the state treasurer in payment thereof. Section 4 provides that the office building shall stand for and be an investment of the industrial accident fund to the extent that such fund is used in the construction of that building. Section 5 provides that, on the first day of July, 1927, and the first day of January and July of each year thereafter, the state treasurer shall prepare and submit to the secretary of state verified vouchers for the amount of interest computed at $4\frac{1}{2}$ per cent per annum, on the unrefunded amount of the industrial accident fund diverted for the construction of the building, interest to run from the date of transfer to the state office building fund. Section 6 provides for an appropriation from the general fund semi-annually, beginning with July, 1927, of the sum of $30,000, for repayment to the industrial accident fund, and that the secretary of state, on the first day of July, 1927,

and the first day of January and July of each year thereafter, shall, by warrant, transfer from the general fund to the industrial accident fund the amount of such appropriation, the same to be applied first to the payment of the amount of the verified vouchers submitted to the secretary of state by the state treasurer pursuant to the preceding section thereof, and the remainder, so far as may be required, to be applied in refunding the principal of the industrial accident fund until the entire amount, including interest, shall have been repaid. Section 7 enacts an emergency clause.

The validity of the assailed act is challenged upon the following grounds:

1. That it creates a debt in excess of $50,000, in violation of Section 7, Article XI, Oregon Constitution.

2. That it appropriates a fund for current expenses and likewise contains provisions upon other subjects, in violation of Section 7, Article IX, Oregon Constitution.

3. That its title embraces more than one subject, in violation of Section 20, Article IV, Oregon Constitution.

4. That it impairs contractual obligations in violation of Section 21, Article I, Oregon Constitution.

The defendants demurred to plaintiffs' complaint, upon the ground that it failed to state facts sufficient to constitute a cause of suit. The demurrer was overruled, and, the defendants refusing to plead further, decree was entered restraining and enjoining the defendants, and each of them, individually, and in their official capacity, from diverting any part of the state industrial accident fund from its present custody or investment, and from investing any part

thereof in the office building of the State of Oregon. The defendants appeal.                              AFFIRMED.

For appellants there was a brief over the names of *Mr. I. H. Van Winkle,* Attorney General, and *Mr. Willis S. Moore,* Assistant Attorney General, with an oral argument by *Mr. Moore.*

For respondents there was a brief over the names of *Messrs. Carey & Kerr* and *Messrs. Wilson & Reilly,* with oral arguments by *Mr. James B. Kerr* and *Mr. James G. Wilson.*

*Mr. Roy F. Shields,* on brief, *amicus curiae.*

BROWN, J.—1, 2. The plaintiffs specifically point out that the act in question offends against the constitutional provision reading:

"The Legislative Assembly shall not lend the credit of the state nor in any manner create any debt or liabilities which shall singly or in the aggregate with previous debts or liabilities exceed the sum of $50,000 * * ." Or. Const., Art. XI, § 7.

Are the plaintiffs proper parties to question the validity of the act under consideration? This is the first question to be determined. It is well settled in this state that only persons who may be injured by its operation may question the validity of a statute: *McKinney* v. *Watson,* 74 Or. 220 (145 Pac. 266). The constitutionality of a legislative enactment will not be adjudged when the party who asserts its invalidity has no interest therein and the question is merely academic.

The Workmen's Compensation Law (Or. L., 6605, et seq.) is an industrial insurance law, optional in character. It was framed and enacted in response

to the demands arising out of modern industrial conditions. It was asserted that it would limit economic waste and that its adoption would be for the common welfare. The law is administered by an agency of the state known as the State Industrial Accident Commission. While the state has appropriated money to forward the purpose of that act, the industrial accident fund largely represents the contributions of employers in the nature of insurance premiums exacted by the provisions thereof. The investment of the fund is secondary, its primary purpose being to compensate workmen or their dependents. With full faith in the promises held forth by the terms of the act, the employer and employee have voluntarily come under its wholesome provisions and have complied therewith. The workman having elected to substitute this compensation for all other remedies, if any, existing to him against his employer, it follows that he is entitled to compensation from the industrial accident fund for accidental injuries sustained in the course of his employment. Under such a state of facts, the plaintiffs have some interest in the industrial accident fund that cannot be diverted by a mere legislative act.

3–6. In the consideration of this case, we commence with the presumption that the statute in question is a valid law. Until overcome, this presumption prevails. In determining the validity of a statute that has been assailed, the courts will resolve all doubts in favor of its constitutionality; and, if the enactment is reasonably susceptible of two constructions, one of which would render it constitutional, the other unconstitutional, the former would prevail. So, throughout our deliberations, we shall bear in mind the following principle underlying statutory construction:

"When courts are called upon to pronounce the invalidity of an act of legislation, passed with all the forms and ceremonies requisite to give it the force of law, they will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light upon the subject, and never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt." 1 Cooley's Constitutional Limitations (8 ed.), p. 371.

But the exercise of the power to hold a law to be invalid because of its conflict with the Constitution is the ultimate and supreme function of courts: *Chicago etc. Ry. Co.* v. *Wellman,* 143 U. S. 343 (36 L. Ed. 176, 12 Sup. Ct. Rep. 400, affirming 83 Mich. 592, 47 N. W. 489).

7–9. In determining the validity of this statute, our decision must be predicated upon the terms thereof and by what it authorizes, and not by what has been done or probably will be done thereunder: *Hood River Lumbering Co.* v. *Wasco County,* 35 Or. 498 (57 Pac. 1017); *Sterett & Oberle Packing Co.* v. *Portland,* 79 Or. 260 (154 Pac. 410); *Purple Truck Garage Co.* v. *Campbell,* 119 Or. 484 (250 Pac. 213); *State* v. *Clement Nat. Bank,* 84 Vt. 167 (78 Atl. 944, Ann. Cas. 1912D, 22); *Minneapolis Brewing Co.* v. *McGillivray,* 104 Fed. 258; *New York* v. *Kelsey,* 158 App. Div. 183 (143 N. Y. Supp. 41); *Cleveland* v. *Watertown,* 99 Misc. Rep. 66 (165 N. Y. Supp. 305); *McCarthy* v. *Moore,* 215 App. Div. 97 (214 N. Y. Supp. 104); *Stuart* v. *Palmer,* 74 N. Y. 188 (30 Am. Rep. 289); *People* v. *Klinck Packing Co.,* 214 N. Y. 138 (108 N. E. 278, Ann. Cas. 1916D, 1051). See the case of *Kinney* v. *Astoria et al.,* 108 Or. 514 (217 Pac. 840).

However, in the recent case of *Weaver* v. *Palmer Bros. Co.*, 270 U. S. 402 (70 L. Ed. 654, 46 Sup. Ct. Rep. 320), Mr. Justice BUTLER, speaking for the Supreme Court of the United States said:

"Invalidity may be shown by things which will be judicially noticed (*Quong Wing* v. *Kirkendall*, 223 U. S. 59, 64 (56 L. Ed. 350, 32 Sup. Ct. Rep. 192), or by facts established by evidence. The burden is on the attacking party to establish the invalidating facts. See *Minnesota Rate Cases*, 230 U. S. 352, 452 (57 L. Ed. 1511, 33 Sup. Ct. Rep. 729, Ann. Cas. 1916A, 18, 48 L. R. A. (N. S.) 1151)."

10, 11. A state Constitution is not a grant, but a limitation, of power, and the legislative assembly may enact any law not forbidden by the fundamental law of the state or federal government. In adjudging the validity of the statute involved in this case, it is not our privilege to consider the desirability, expediency, policy, justice or wisdom of its enactment. The fundamental law of this commonwealth is expressed in a written Constitution. Under this scheme of government, enacted by the people, the governing powers were divided into three departments: "The legislative, the executive, including the administrative, and the judicial." That Constitution prescribes the confines within which the several departments shall function, and expressly forbids the encroachment of one department upon the powers of another. Or. Const., Art. III. It defines to a certainty the powers of the legislative department with reference to the creation of an indebtedness or liability. With jealous care it guards the property and the productive industries of the people from the payment of large debts at a future time. The Constitution of Oregon as originally enacted was the expression of

a fundamental law by a conservative people. This must be so. In their earnest endeavor to protect posterity from the burdens of indebtedness, the framers of the original Constitution limited the powers that the legislative department might assert, and for more than forty years after its adoption the people refused to alter or amend it. No one idea stands out more clearly than that the framers of the Constitution sought to set up a barrier against the creation of a voluntary indebtedness by the state, or by the counties or municipalities thereof, in excess of specified amounts.

12. There is much discussion in the briefs as to whether the funds proposed to be invested in an office building for the State of Oregon are the property of the state, or a trust fund in the possession of the state to be administered in accordance with the terms of the Workmen's Compensation Law. The act in question does not treat the industrial accident fund as the absolute property of the state, but as a trust fund, subject to investment. From the title we take the following excerpt:

"An act providing for * * the investment of part of the industrial accident fund."

The term "invest" is thus defined:

"Invest. * * As used in connection with money or capital, to apply money in the purchase of some property from which interest or profit is expected and which property is purchased in order to be held for the sake of the income which it will yield." 33 C. J., p. 807.

In the case of *Stramann* v. *Scheeren*, 7 Colo. App. 1 (42 Pac. 191), a case where the money was advanced to go into a building, the court said:

"The words 'invest' and 'investment' have a well-defined legal definition.  And, Law Dict.: ' "Invest." ' To place money so that it will yield a profit. * * In common parlance, putting out money on interest, either by the way of loan or by the purchase of income-producing property.'  Cent. Dict.: 'To employ for some profitable use; convert into some other form of wealth, usually of a more or less permanent nature, as in the purchase of property or shares, or in loans secured by mortgage.'  It will be seen that, in all cases of investment, although the specific character of the property is changed, *the title and control remain with the investor.*"

Section 2 of the act under consideration uses the terms "invested" and "uninvested" in the sense as defined above, and Section 4 provides that the "office building shall stand for and be an investment of the industrial accident fund."  Section 5 provides for the payment of interest at the rate of 4½ per cent per annum on the unrefunded amount of the industrial accident fund diverted for the purposes of the act. Finally, Section 6 appropriates from the general fund $60,000 annually for the repayment to the industrial accident fund.  So we have here an enactment providing for the temporary investment of a fund, for the payment of interest as compensation for the use of the fund at the rate of 4½ per cent per annum, and for the ultimate repayment of the original fund so invested at the rate of $60,000 per annum, principal and interest.

The payment of interest at a given time and at a given rate is one of the unerring tests of a loan of money.  In support of this proposition, note the following from *Rodman* v. *Munson,* 13 Barb. (N. Y.) 63:

"The presence of interest in the transaction is a feature of most significant import.  Interest proceeds

from money or property lent by one person to another, or from debts, legacies or sums of money due or to grow due and payable from one person to another. Whenever there is interest payable, there exists a corresponding obligation, somewhere, to pay it. 'Interest is the sum paid by the borrower of a sum of money, or of some sort of valuable produce, to the lender for its use.' (2 McCullough's Com. Dic. 96.) Interest is the 'premium paid for the use of money; the profit per cent. derived from money lent, or property used by another person, or from debts remaining unpaid.' (Webster's Dic.) * * For what consideration are these persons to receive this interest periodically from the public treasury? In consideration that the state has the use of their money, and upon no other consideration that has yet been named. The money is paid over to the state at its request and applied to its use. There is an agreement to pay the interest regularly, and repay the principal at an appointed time. If it is not a loan, what is it? It is not a gift. It is not a mere deposit for safe keeping, at the risk of the depositor. * * As it is neither a gift, a deposit, the payment of a debt, or an equivalent for property purchased, and as it lacks none of the essential properties of a loan, I cannot do otherwise than regard it as a loan.''

The case of *Coulson et al.* v. *Portland,* 6 Fed. Cas. 629 (Case No. 3275), a leading case on the question involved herein, opinion by Judge Deady, president of the Constitutional Convention of Oregon that adopted as a part of the fundamental law the constitutional provision invoked by the plaintiff, is illuminating. The eminent judge, in discussing the charter provision prohibiting the City of Portland from incurring an indebtedness in excess of $50,000, says:

''The second objection raises the question: Can the city lawfully issue interest coupons to railway bonds,

payable half yearly through a period of twenty years, and amounting in the aggregate to over $300,000? The charter (section 135) seems to answer this question in the negative when it substantially declares in pursuance of section 5, article 11, of the Constitution, that the indebtedness or liability of the city must never exceed in the aggregate one sixth of that sum. But the defendants insist that, as the ordinance providing for the issue of these coupons also provides for raising revenue and appropriates it to the payment of them as they fall due, no indebtedness or liability is thereby created or incurred. In support of this extraordinary proposition, they cite the single case of *People* v. *Pacheco*, 27 Cal. 175 * * . I have never been able to bring my mind to assent to the reasoning by which the court arrived at the conclusion that the act in question did not create a debt. By means of such artificial reasoning and unlooked-for construction of popular and plain terms and phrases, constitutions may be purged of every prohibition upon the legislative power of taxation and creating indebtedness which the wisdom or fears of the people may place in them.

"These constitutional provisions restraining the creation of public debts are the gradual outgrowth of the last twenty or thirty years. * * To say that a sum of money due or owing from A to B is not a debt because A has promised to appropriate, or has appropriated, a portion of his future income to its payment, is a proposition in legal metaphysics that I cannot comprehend. A debt exists against the city whenever the city agrees to pay money in return for services or for money borrowed. Every one of these interest coupons, when issued by the mayor and auditor as presented in the ordinance, is a promise by it to pay to the holder so much money. If this is not a debt, or evidence of one, then an ordinary promissory note is not. The fact that the ordinance appropriates money to pay these coupons as they fall due makes no difference. There is no magic in the legislative

formula—'there is hereby appropriated.' That does not change the fact that the city owes these coupons, and what it owes to another is a debt due that other. Besides, there is no money in fact set apart by this formula of appropriation until it is collected. The ordinance, by providing for the levy and collection of taxes to pay these coupons, recognizes the fact that their issue creates a debt against the city and thereby undertakes to provide means of payment. But the object of the prohibition in section 135 of the charter is to prevent the council from pledging the future resources of the city beyond the sum of $50,000. The language of the prohibition is explicit and comprehensive. It includes all forms of indebtedness, 'whether incurred by borrowing money, loaning the credit of the city, or otherwise.' ''

The case of *State ex rel. University of Utah* v. *Candland*, 36 Utah, 406 (104 Pac. 285, 140 Am. St. Rep 834, 24 L. R. A. (N. S.) 1260, involves the validity of an act of the legislature of Utah authorizing the loan of $250,000 from the university permanent land fund for the construction of a building for the university of that state. The validity of the act was assailed upon the ground that it was in violation of a constitutional inhibition against the state's contracting any debts or liabilities exceeding in the aggregate at one time the sum of $200,000. We here quote largely from the body of the opinion because of its valuable discussion of the phrase ''shall never contract any indebtedness'':

''The phrase 'shall never contract any indebtedness,' in our judgment includes any obligation which the state undertakes or is obligated to pay or discharge out of future appropriations; that is, appropriations not made by the legislature creating the debt or obligation, and to be paid from moneys derived from levies other than those made by the

then existing legislature, and which must necessarily be raised by levying a tax upon the property of the entire state, as contradistinguished from a mere city, county or district levy. In other words, in order to constitute an indebtedness within the provisions of the constitutional limitation, it is not necessary that the debt be evidenced by bonds, notes or other usual evidences of indebtedness, but it is sufficient if, in order to discharge the debt, the state is obligated to pay it at some future time, and that it casts a future burden upon the taxpayer to the extent of a debt or obligation which must be paid by the state of Utah with funds derived from general taxation. In the following cases, the general question of what constitutes an indebtedness within a constitutional limitation clause similar to ours is fully discussed and applied. A careful perusal of these cases will, we think, convince anyone that the method adopted by the act of 1909 makes the debt or obligation authorized by the act a debt of the state of Utah pure and simple. Among other cases which might be cited, we specially refer to the following: *People* v. *Johnson,* 6 Cal. 503; *Nougues* v. *Douglass,* 7 Cal. 77; *Coulson* v. *Portland,* 6 Fed. Cas. 629 (Case No. 3275); *Sloan, Stevens & Morris* v. *State,* 51 Wis. 632 (3 N. W. 393); *State* v. *McMillan,* 12 N. D. 300 (96 N. W. 316); *McNeal* v. *City of Waco,* 89 Tex. 83 (33 S. W. 324); *State* v. *City of Helena,* 24 Mont. 521 (63 Pac. 99, 81 Am. St. Rep. 453, 55 L. R. A. 336); *Council Bluffs* v. *Stewart,* 51 Iowa, 385 (1 N. W. 628); *French* v. *Burlington,* 42 Iowa, 614; *City of Springfield* v. *Edwards,* 84 Ill. 632; *Law* v. *People,* 87 Ill. 385; *Prince* v. *City of Quincy,* 128 Ill. 443 (21 N. E. 768); *Buchanan* v. *Litchfield,* 102 U. S. 278 (26 L. Ed. 138, see, also, Rose's U. S. Notes); *Litchfield* v. *Ballou,* 114 U. S. 190 (29 L. Ed. 132, 5 Sup. Ct. Rep. 820). * *

"There is not the slightest attempt in the act to conceal the fact that the debt authorized by it must be paid, both principal and interest, from appropriations made from the funds of the state, which are obtained by general taxation. * *

"As is well said by the Supreme Court of California in referring to a similar constitutional provision in the case of *Pattison* v. *Board, etc.,* 13 Cal. 183: 'The intent of this clause of the Constitution is plain enough; it was designed as a check on legislation, and on such legislation as might create a charge upon the property of the entire state.' Is it not palpable that the obligation in question creates a charge upon the entire property of the state in the form of interest alone amounting to more than $130,000, and as principal and interest aggregating a sum in excess of $380,000, all of which must be paid within the time limit fixed in the act, and must be paid with moneys obtained from general taxation and appropriated out of the general funds of the state? If this does not constitute a state indebtedness, we cannot conceive how one can be created unless it would be by issuing state bonds. If an attempt had been made to issue state bonds to the amount of $250,000, no one would question their unconstitutionality because in excess of the constitutional debt limit, yet the necessary money for the payment of such bonds, both principal and interest, would have to be, and would be, obtained precisely in the same manner as the money must, and is, in fact, directed to be obtained for the payment of the obligation in question."

With certain exceptions, the Constitution forbids counties from creating "any debts or liabilities which shall singly or in the aggregate with previous indebtedness or liabilities exceed the sum of $5,000." Or. Const., Art. XI, § 10.

In 1905, the legislature passed an act authorizing the construction of a courthouse for Clatsop County, which was intended to evade the prohibition just quoted. In this connection, the opinion of Mr. Justice BEAN, speaking for this court in the case of *Brix* v. *Clatsop County,* 46 Or. 223 (80 Pac. 650), which grew

out of that legislation, is enlightening. The justice wrote:

"The Constitution plainly prohibits a county from contracting debts or liabilities which singly or in the aggregate shall exceed $5,000, except for a specific purpose. A contract by it to pay a certain sum of money in the future, with interest, out of money to be thereafter raised by general taxation from all the people, whether the levy be made at one time, covering that future, or has to be made yearly, is manifestly a debt or liability against the municipality; and no technical process of reasoning, legal acumen or jugglery of words can make the fact otherwise. The moment an obligation to pay money is voluntarily incurred by a municipality with no funds or assets in its treasury, nor current funds or revenue collected or in process of collection, for the payment of the same, that moment such obligation must be considered in determining its indebtedness, however carefully the law or the contract under or by which it was incurred may attempt to shift the burden from the corporate entity to the taxpayers.* * The money must come from the taxpayers, whatever may be the language of the law authorizing its exaction, or of the contract providing for its payment, and the Constitution cannot be avoided by providing a special tax to be levied in advance for a series of years, and making such contract payable alone therefrom. * *

"The Constitution was intended to protect the taxpayers. Its language is plain and unambiguous, and the court is not justified in giving it a strained or astute interpretation to avoid individual or local hardship. It is its duty to enforce the provisions as written, according to their plain and obvious meaning, and not to permit it to be circumvented by shifting the burden of a debt from the municipal entity to the taxpayers."

Subsequent to the enactment of the law forming the subject matter of the litigation now pending, the leg-

islature passed Chapter 383, General Laws of Oregon, 1927, entitled:

"An Act providing for the use and occupancy of state buildings in Oregon by state officers, boards, and commissions."

The act provides for the collection of rentals from the various boards and commissions, which shall be paid into the general fund. It does not, however, remove the constitutional objection to the enactment assailed. In passing the act involved herein, the legislature well knew that it was making appropriations beyond the revenues in sight, and, to aid the situation, passed Chapter 383, providing for additional revenue. This is evidenced by the statement contained in the official pamphlet, and emanating from the joint committee of the Senate and House of Representatives, in explanation of the proposed constitutional amendment popularly known as the State Tax Limitation Amendment. This statement, made by the committee for the information of the voters, reads, in part:

"Under the Constitution as it stands today, the total tax levy for 1928 cannot exceed $2,289,600, or over $1,200,000 less than the 1923 levy. The state has grown and is growing, and the cost of government in 1928 must necessarily be more than it was in 1923. If the credit of this state is to be maintained, this amendment is absolutely essential. Surely we do not wish to go upon a warrant basis, run the state into debt and pay six per cent. interest on such indebtedness. That would only be deferring taxes which must eventually be levied to re-establish the credit of the state. It would not be economy, but a burden which must be lifted later. * * The legislature passed appropriations at the 1927 session of approximately $4,000,000 in excess of available revenues un-

der the present constitutional limit, and Governor Patterson was compelled to veto approximately $1,300,000 thereof, still leaving a deficiency of about $2,700,000 at the end of 1928, unless the income tax measure carries. The appropriations vetoed were practically all necessary, and consisted largely of capital investment in new buildings, etc., which we will have to manage to get along without. * * Oregon must pay her bills and conduct her state affairs on a businesslike basis.'' Voters' Pamphlet, p. 31.

13. The foregoing are facts presumed to be known, and the court will take judicial knowledge thereof: Or. L., § 729, subds. 3, 8.

14. It is palpably clear to the mind of the writer that certain provisions of the statute forming the subject matter of this litigation are in direct conflict with the constitutional inhibition against the creation of ''any debts or liabilities'' in excess of $50,000. Both cannot stand. The statute must yield to the supreme law of the state. This applies to the statute in its entirety, because its provisions are so related in purpose and substance that it is not reasonable to suppose that the legislature would have enacted the section relating to the investment of the industrial accident fund without making valid provision for the repayment thereof.

''If the obnoxious section or part is of such import that the other sections or parts without it would cause results not contemplated or desired by the legislature, then the entire statute must be held inoperative.'' 1 Lewis' Sutherland on Statutory Construction, § 297.

See, also, *Portland* v. *Coffey,* 67 Or. 507 (135 Pac. 358).

We hold the statute in question to be unconstitutional.

This case is affirmed.                            AFFIRMED.

BURNETT, C. J., and RAND and BEAN, JJ., concur.

COSHOW, J., Dissenting.—This is an appeal from a decree enjoining defendants from using the industrial accident fund of the State of Oregon to construct an office building for the state. The 1927 session of the legislature enacted the following statute:

"Section 1. The Oregon state board of control is hereby authorized and directed to cause to be constructed in Salem, Marion County, Oregon, a modern fireproof office building for the State of Oregon, and to invest the state industrial accident fund in an amount not to exceed the sum of $600,000.00 in said building.

"Section 2. To provide funds for the construction of said building the state treasurer is hereby authorized and directed to sell bonds in which said funds may be invested; such sales shall be made from time to time as requested by the Oregon state board of control, and the proceeds thereof shall be deposited in the state treasury to the credit of a fund which shall be known as the state office building fund. The state treasurer is hereby further authorized, in his discretion, to deposit to the credit of the said fund any uninvested part of the industrial accident fund in the state treasury; provided, the total amount thus deposited, including proceeds from the sale of bonds, shall not exceed the sum of $600,000. Said fund is hereby appropriated for the purpose of constructing the said office building for use by the various departments of the state of Oregon that may be assigned offices therein.

"Section 3. The secretary of state is hereby authorized and directed to audit all duly approved claims which have been incurred in pursuance of law

and the foregoing appropriation, and to draw his warrant upon the state treasurer in payment thereof upon presentation of proper vouchers duly verified.

"Section 4.  The state office building shall stand for and be an investment of the industrial accident fund to the extent that same is used in the construction of said office building or to the extent of any unrefunded balance thereof.

"Section 5.  On the first day of July, 1927, and the first day of January and July annually thereafter, the state treasurer shall prepare and submit to the secretary of state duly verified vouchers for the amount of interest computed at $4\frac{1}{2}$ per cent per annum on the unrefunded amount of the industrial accident fund diverted for the purpose of this act.  Interest shall begin to run from the date of transfer to the state office building fund of the different installments of the industrial accident fund.

"Section 6.  There is hereby appropriated from the general fund semi-annually, beginning with July, 1927, the sum of $30,000 for the repayment to the industrial accident fund.  The secretary of state shall, on the first day of July, 1927, and on the first day of January and July annually thereafter, by warrant, transfer from the general fund to the industrial accident fund the amount of said appropriation, and same shall be applied first to the payment of the amount of the verified vouchers submitted to the secretary of state on said dates by the state treasurer, pursuant to section 5 hereof, and the remainder, so far as may be required, shall be applied in refunding the principal of the industrial accident fund until the entire amount of the same, including interest, shall have been repaid.

"Section 7.  It is hereby adjudged and declared that existing conditions are such that this act is necessary for the immediate preservation of the public peace, health and safety; and, owing to the urgent necessity of maintaining the public credit, an emergency is hereby declared to exist, and this act shall

take effect and be in full force and effect from and after its approval by the governor.''

Plaintiffs attack this as unconstitutional on four different grounds, to wit: First, that said act attempts to create a debt and liability of the State of Oregon in excess of the sum of $50,000. Second, that said act makes appropriation for current expenses of the state and other subjects in violation of Article IX, Section 7 of the state Constitution. Third, that said act embraces more than one subject in violation of Article IV, Section 20 of the state Constitution. Fourth, that said act impairs the obligations of a contract in violation of Article I, Section 10 of the federal Constitution and of Article I, Section 21 of the state Constitution. A demurrer was interposed in behalf of defendants and overruled by the Circuit Court. This appeal is from the decree entered after defendants refused to further plead.

The Workmen's Compensation Act is an exercise of the police power of the state: Honnold on Workmen's Compensation, p. 58, § 12, Workmen's Compensation Act (C. J.), 15. The act itself specifies as a reason for its enactment

''That in determining the responsibility of the employer on account of injuries sustained by his workmen, a great and unnecessary cost is now incurred in litigation, which cost is divided between the workmen, the employers and *the taxpayers, who provide the public funds, without any corresponding benefit,* to maintain courts and juries to determine the question of responsibility under the law as it now exists, and that the state and its taxpayers are subjected to a heavy burden in providing care and support for such injured workmen and their dependents, and that this burden should, in so far as may be consistent with the

rights and obligations of the people of the state, be more fairly distributed as in this act provided." Or. L., § 6605.

·The act is for the public welfare. The money contributed by the state is and that contributed by employers and employees becomes the property of the state. Those contributions comprise the industrial accident fund. This fund is to be invested by the state treasurer: Or. L., § 6625, as amended by Chapter 188, General Laws of Oregon of 1927.

" * * The state treasurer shall, to such extent as shall appear to him to be advisable, keep the moneys of the unsegregated portion of the accident fund invested at interest in the class of securities authorized for the investment by banks of savings deposits under the laws of this state. The state treasurer shall be liable on his official bond for the safe custody of the moneys and securities of the accident fund and the segregated accident fund." Or. L., § 6638 as amended by General Laws of Oregon of 1925, page 204.

Other provisions for the investment of the fund are found in General Laws, 1921, Chap. 256.

The money is contributed for a definite purpose and the amounts so contributed are designated a certain fund for the purpose of administering the law according to its terms. This appeal has been very ably argued and much learning has been presented in both the briefs and oral arguments of counsel. It has been presented, however, by plaintiffs upon the theory that the fund thus created for the purpose of administering the Workmen's Compensation Act will be depleted or invaded by the law assailed. That law does not authorize either. It specifically authorizes the investment not to exceed $600,000 of that fund in

an office building belonging to the state, as does the fund, and expressly provides that said office building shall stand for and be an investment of the industrial accident fund. So that all that is done by the act under consideration is to change the form of the investment of the industrial accident fund. Instead of the state treasurer holding bonds as an investment of the accident fund he is to hold the office building as an investment of that fund. The act also provides for the payment of 4½ per cent interest on the amount invested in the office building. Doubtless this is the equivalent of the interest that the state treasurer is able to get from the funds now invested. There is nothing in the act that indicates to any degree or in any manner that the legislature intended to divert any part of the industrial accident fund from the purpose for which it was created.

The act also appropriates the sum of $30,000 to be paid semi-annually to the industrial accident fund. Assuming that the entire sum of $600,000 will be invested in the office building the payment of $30,000 semi-annually to the fund as provided in the act will reconvert the amount invested in the office building with interest at 4½ per cent per annum into other forms of investments in thirteen and one-half years. The act itself, therefore, manifests the intention of the legislature not only to invest the funds of the industrial accident fund in an office building but also provides that said form of investment is to be temporary. There is no language in the act that would justify the court in assuming that the legislature has or intended to divert any part of the industrial accident fund from its original purpose. We are not, therefore, called upon to discuss what the legislature might do with that fund if the Workmen's Compen-

sation Act were repealed. We are not required to consider what some future legislature may enact. Such discussions are speculative entirely and have nothing to do with the act under examination. It was well said by Mr. Justice HARRIS in *Kinney* v. *Astoria,* 108 Or. 514, 525 (217 Pac. 840) :

"The judicial department must, when passing upon the nature of the purpose of a statute, base its decision upon the matters appearing upon the face of the statute, and possibly facts of which judicial notice may be taken may also be considered; but ordinarily a court cannot make an independent inquiry as to facts which do not appear in the statute and are discoverable only outside of the provisions of the statute, and then, based upon such extraneous facts, say that the statute is unconstitutional."

Plaintiffs do not rely upon facts in support of their argument that the act is unconstitutional but resort to imagination and summon the possibilities of a future legislature diverting the accident fund from its original purpose.

The legislature had directed the investment of the accident fund. Its power to so do is not questioned in this case. It then has the power to change the form of investment and that is all that is attempted to be done by the act involved in this case. The language of the act not only specifies that the fund to be used in the construction of the building is an investment of the fund but specifically describes the manner for changing the investment in the office building into money to be re-invested as the Workmen's Compensation Act directs. There is no conversion or diversion of any part of the fund authorized by the act under consideration.

The state is now paying a large sum of money annually for the use of other buildings. At the present

time that sum is $36,481.50 per annum. This amount is likely to grow larger with the growth of the state. The state has a large amount of money in the accident fund. Under the law that fund must be invested. Instead of investing the money in liquid securities the act assailed directs the investment in an office building which is to belong to the state. The same legislature which enacted the act involved in the instant case also passed an act authorizing the collection of rent from certain of the state's bureaus and commissions which are to use space in said office building. The legislature thereby provided revenue to meet in part the appropriations in the act under consideration: Gen. Laws 1927, Chap. 383. Thus the taxpayers of the state, without any additional tax but with the expenditure of a comparatively small amount of the general fund of the state, will receive an office building. This is made possible by requiring the bureaus and commissions now paying rent to private parties for office space away from the capitol to continue paying rent, but to the state, while occupying space in the office building belonging to the state. So that instead of these various agencies of the state paying rental to private owners of property they are paying the rent to the state itself. By this arrangement the state invests in absolute safety the accident fund which will bear the reasonable income of 4½ per cent per annum. The state by the continuous paying of rental for the use of office space by its various bureaus and commissions obtains a permanent office building. In thirteen and one-half years the amount appropriated by the state for that purpose will retransfer the investment of the accident fund into other forms of securities. The rentals collected by the state provide a revenue almost suffi-

cient to meet the appropriation made by the act. The money is appropriated semi-annually. Taxes are payable semi-annually. The appropriation in the act is continuous to be paid from anticipated revenue. The anticipated revenue is largely from expected rentals and the balance from the general fund. No additional tax is contemplated or provided for. Such appropriations are lawful in this state: *Kinney* v. *Astoria,* 108 Or. 514 (217 Pac. 840); *Holmes* v. *Olcott,* 96 Or. 33 (189 Pac. 202); *Wingate* v. *Clatsop County,* 71 Or. 94, 102 (142 Pac. 561). There is no presumption that the appropriation will create a debt. The presumption is the contrary. The state will have its office building. The accident fund is kept intact, kept invested and kept earning an income. By the same act ample provision is made for reconverting the investment in the office building into such other securities as the legislature may authorize. Unless an act appropriating money shows on its face the creation of an indebtedness it will be presumed that the appropriation is made from funds on hand or anticipated: *Wingate* v. *Clatsop County,* above. There is no presumption of the unconstitutionality of an act of the legislature. In legal contemplation the state has an inexhaustible fund from which to meet its obligations: Const., Art. I, § 18; 20 C. J. 832 et seq., § 269; *Branson* v. *Gee,* 25 Or. 462 (36 Pac. 527, 24 L. R. A. 355); *Oregonian Ry. Co.* v. *Hill,* 9 Or. 377, 381. It does not appear either in the act or from the complaint that the amount appropriated exceeds in any sum the revenue in the state treasury and the revenue anticipated.

The state owns the accident fund. It will own the office building. If investing the accident fund in an office building creates an indebtedness against the

state the state is now indebted for that fund. The most the act assailed does is to change the form of investment. Whom does or will the state owe? There is no creditor. Our conclusion is that Chapter 322, Gen. Laws 1927, does not create an indebtedness against the state in violation of the Constitution.

Since it is conceded that the state has the power to invest the accident fund it naturally follows that the legislature is authorized to direct that power. Changing the form of the investment of that fund does not create an indebtedness. The only *indicia* of indebtedness in the act is the payment of 4½ per cent interest and the appropriation of $60,000 payable in equal semi-annual installments. But this is merely a transfer of that amount from the general fund to the accident fund. It is not the payment of a debt because there is no creditor. There must be a creditor and a debtor where a debt exists. Reconversion of the money invested in the office building into liquid securities is an expression of the legislative intent to invest permanently the accident fund in liquid securities. That policy may be changed by the legislature whenever it wills so to do.

Every presumption favors the validity of the statute. Courts have no more right to declare the appropriation of said $60,000 a debt against the state than they have to hold the appropriation of $82,750 for various purposes under House Bill 577 of the same session a debt. The presumption is that the money is in the treasury to meet the appropriation.

It is a cardinal rule of construction that all legislation on the same subject must be construed together: *Taggart* v. *School Dist. No. 1,* 96 Or. 422, 427 (188 Pac. 908, 1119). This principle applies with special force where different acts on the same subject

were enacted at the same legislative session. Chapter 383 of 1927 Laws authorizes the collection of rent from certain boards and commissions which will occupy the office building. The rent so collected will be placed in the general fund. What possible purpose can the state have for collecting from its boards and commissions rent except the purpose of meeting the appropriation for the payment semi-annually of $30,000 to reconvert the accident fund invested in the office building into liquid securities? So, if by some mental contortion the amount to be invested in the office building can be termed a debt, without either creditor or debtor, a source of revenue has been provided for paying that indebtedness in due course. Chapter 322, Laws 1927, does not therefore create a debt within the constitutional inhibition against contracting a debt exceeding $50,000: *Wingate* v. *Clatsop County*, 71 Or. 94, 102 (142 Pac. 561). This result is attained not by jugglery of words or trickery of expression, but by collecting rental from certain users of the building until the building shall have been paid for.

The second ground of attack on said act is that it makes an appropriation for current expenses and also contains provisions on other subjects in violation of Article IX, Section 7 of the state Constitution. This ground is based upon the assumption that the state is borrowing money from the accident fund. But as shown above the state is not borrowing. It is merely using its own.

The act does not purport to pay current expenses. The only appropriation is for "repayment to the industrial accident fund." The money is not borrowed from the industrial accident fund but is an investment of those funds. The state would be both bor-

rower and lender if the use of the fund constitutes a loan. It is true the language of the act is "repayment." The court will look to the entire act to ascertain the intent of the legislature and not be controlled by the meaning of words taken from their context. It is lawful for the legislature to provide for the payment of the building it proposes to construct. The payment for the structure is a necessary element of the law authorizing its construction. Payment is directly connected with the primary object of the act which is the construction of an office building. The investment of the accident fund is directly connected with the primary purpose of the act. It would be impracticable to require the legislature to enact separate statutes for all the incidental matter relating to the primary object of the act. The investment of the accident fund and the appropriation for the purpose of reconverting the fund into other forms of security are so closely related to the primary purpose that the act does not offend Article IX, Section 7 of the state Constitution: *Evanhoff* v. *State Industrial Acc. Com.*, 78 Or. 503 (154 Pac. 106).

The act does not conflict with the provisions of Article IV, Section 20 of the Constitution because it does not embrace more than one subject and matters properly connected therewith. The subject is clearly expressed in the title: *First State Bank of Sutherlin* v. *Kendall Lumber Co.*, 107 Or. 1 (213 Pac. 142). The act does not attempt to regulate the investment of the accident fund generally but in so far only as it is incidental to and directly connected with the construction of the office building.

The act does not impair the obligation of a contract within the meaning of either Article I, Section 10 of the federal Constitution or Article I, Section 21

of the state Constitution. The relation between the state and the employers and employees is not contractual. The first section of the act indicates in part the reason for its enactment. It is a general law enacted for the benefit of the people of the state. The state in its sovereign capacity has contributed a large amount to the fund. The amount contributed by the other contributors is the property of the state. There is a contractual relation between the employers and the employees who are within the act. Neither the contributing employers or employees retain any interest in the amount contributed. The state by general law has been a contributor to the fund and has undertaken to administer it for the purpose for which it was created and according to the terms of the act. The fact that the Workmen's Compensation Act in this state is voluntary does not change the purpose and spirit of the act. Whether the Workmen's Compensation Act is compulsory or voluntary its enactment is an exercise of the police power of the state. It is for the general welfare. Its purpose is not only to relieve, as far as humanly possible the suffering of those who are injured, many whom with their families are likely to become public charges, but was also intended to relieve the taxpayers of the state of a large part of the burden of maintaining courts: *Mountain Timber Co.* v. *Washington,* 243 U. S. 219 (61 L. Ed. 685, Ann. Cas. 1917D, 642, 37 Sup. Ct. Rep. 260). It is true this court in *West* v. *Kozer,* 104 Or. 94 (206 Pac. 542), spoke of the act as being a contract between the employer, employee and the state. Reading the entire opinion, however, it clearly appears that the learned justice writing the opinion did not intend to use the word "contract" in the sense it is used in the Constitution. It will be observed also

that the then Chief Justice did not concur in the statement that:

"There is no doubt of the existence of a contract between employer, the employee and the state."

The later case of *Spitzer* v. *The Annette Rolph,* 110 Or. 461, 475 (218 Pac. 748, 223 Pac. 253), the opinion in which was written by the same justice who wrote the majority opinion in *West* v. *Kozer,* above, more accurately expresses the relation of the beneficiaries of the accident fund in this language:

"The rights of a workman here to compensation from the state industrial accident fund arise from a contract, either express or implied, between employee and employer embraced within the terms of the act: *West* v. *Kozer,* 104 Or. 94 (206 Pac. 542)."

It thus appears that it was not the intention of the writer of the opinion in *West* v. *Kozer* to hold that the state was a contracting party in the sense in which the word "contract" is generally used or as it is used in the state Constitution. In the case of *Butterfield* v. *State Industrial Acc. Com.,* 111 Or. 149 (223 Pac. 941, 226 Pac. 216), the point under consideration was the right of the State of Oregon to appeal in an action against the State Industrial Accident Commission. The excerpt from *West* v. *Kozer* there appearing was not quoted for the purpose of showing that the state sustains a contractual relation with the employers and employees but for the purpose of explaining the former opinion holding that the State of Oregon, not being a party to the action, could not appeal. *Butterfield* v. *State Industrial Acc. Com.,* above, is not an authority supporting the position taken by plaintiffs that the state has contracted to keep the accident fund in certain forms of investments indefinitely.

But we repeat that the act does not manifest any intention to impair to any extent the accident fund. It is kept intact. It is kept invested. Plaintiffs have not alleged any way or manner in which they are injured or can be injured, except by calling to their aid their imagination of what some future legislature may do. Speculation as to future acts of the legislature can never be a proper basis for declaring an act un-constitutional. The invalidity of an act must appear on its face beyond a reasonable doubt before the court will declare it unconstitutional: *Kinney* v. *Astoria,* quoted above; *Miller* v. *Henry,* 62 Or. 4 (124 Pac. 197, 41 L. R. A. (N. S.) 97).

The acts of the legislature directing the investment of the accident fund in specified securities and providing for the distribution of the surplus in excess of $300,000 do not operate to render unconstitutional said Chapter 322. The legislature having the power to invest the funds may change the form of the investments from time to time as, in its judgment, is for the best interests of the fund. We cannot assume that the legislature will at any time dissipate that fund. The presumption is that it will sacredly guard and protect it. Every legislature since the enactment of the statute has clearly manifested that intention. The same intention is clearly manifested in said Chapter 322.

The decree should be reversed and one entered here dismissing the suit.

McBRIDE and BELT, JJ., concur in this opinion.

Reversed on rehearing February 14, 1928.

ON REHEARING.

[264 Pac. 441.]

REVERSED ON REHEARING.

For appellants there was a brief over the name of *Mr. I. H. Van Winkle,* Attorney General, with an oral argument by *Mr. Willis S. Moore,* Assistant Attorney General.

For respondents there was a brief over the names of *Messrs. Wilson & Reilly* and *Messrs. Carey & Kerr,* with oral arguments by *Mr. Jas. B. Kerr* and *Mr. Jas. G. Wilson.*

*Mr. Roy F. Shields* and *Mr. Fred H. Paulus, amici curiae.*

ROSSMAN, J.—Much has already been written by the court in setting forth its construction of the building act and the debt clause of our state Constitution. No useful object would be served in adding an extensive third opinion to the two already published. We shall, therefore, confine ourselves to a brief statement of our views.

15. The building act proposes to use $600,000 of the industrial accident fund in the construction of an office building. The plaintiffs declare that the employment of this money in this manner will create a debt. To have that effect we must find present three necessary elements: a debtor, a creditor, a promise to pay. If the industrial accident fund is the absolute property of the state, an expenditure from it in behalf

of the state cannot create a debt. For the orderly transaction of its affairs, the state recognizes particular sums of money appropriated to its different bureaus and departments as funds; whenever it diverts money from a use intended when the fund was created to some other purpose, it may charge itself with a duty to replenish the fund; but no debt is created thereby. Indeed, 1927 Session Laws, Chapter 308, which is the general act governing overdrafts of the different departments and bureaus, imposes a duty upon any department having a deficit, to pay the overdraft and interest at the rate of 2 per cent per annum to the fund which supplied the necessary balance. No debt in the sense contemplated by the constitutional inhibition is created thereby, because the debtor-creditor element is wanting. The various departments, bureaus and commissions are not personages to the extent that they are creditors or debtors. The use of the words "repayment" and "refund" occurring in Section 6 which plaintiffs rely upon can be well reconciled with the foregoing; that is, that funds must be kept intact, and accordingly the legislature made provision for replenishing the industrial accident fund. Hence, if the state is the absolute owner of the industrial accident fund, no debt arises when it uses $600,000 for the construction of a building, however unwise it might be to use the fund for such a purpose.

16. But, let us now assume that the fund is a trust fund, and not the absolute property of the state. This is a serious step to take, for when we have once taken it, a concession has been made that the $2,000,000 comprising the fund is not the absolute property of the state. When we have made this concession the beneficial interest is in the employer-employee class,

although the state has put into the fund $1,000,000 of
state money, and has supplied the commission with
office space and many conveniences.    Furthermore, to
make this concession carries with it another: the state
can never recover the $1,000,000 it appropriated to
the use of the commission to enable it to carry on its
work before income and expenses met, although the
recoupment of such donations is generally a pre-
·rogative of sovereignty.    We find nothing in the legis-
lative act warranting such concessions.

But for the sake of proceeding into our next in-
vestigation let us grant all of this.    Nevertheless it
remains true, that the legislature has the right to
determine how the fund shall be invested.    Prior to
1927 the fund has been invested in certain types of
securities.    The 1927 legislative assembly evidently
felt that the state needed an office building; this need
is recognized in the dissenting opinion.    We see the
need expressed in 1927 Session Laws, Chapter 77,
which directs the board of control to "lease one or
more office buildings, or parts thereof, in the city of
Salem, on such terms and under such conditions as it
may deem advisable."    1927 Session Laws, Chapter
78, confers authority upon the same board to lease
an office building, or space in one, in Portland.    The
brief of counsel in this case has vouched for the fact
that the state annually expends $36,481.50 for rental
of office space, and the same source of information is
authority for the statement that the space thus pro-
cured is scattered about in many buildings.    Con-
fronted with these circumstances, the legislature evi-
dently felt it would be justifiable to use $600,000 now
invested in bonds, and with it construct an office
building.    If the bonds were the property of the com-
mission, the legislature evidently proposed that the

building should likewise become the property of the commission, and so it wrote that the building shall "stand for and be an investment" of the funds of the commission. It is not an uncommon thing for insurance companies to build office buildings as investments for their funds. A companion act of the foregoing piece of legislation (1927 Session Laws, Chap. 383), directs the Secretary of State to assign space in the new building, upon completion, to state officers, boards and commissions, and provides that the board of control shall fix the amount of rent to be paid for the use of the quarters assigned. It would seem strange that the state would pay rent for the use of a building it owned. The payment of rent, however, can be very nicely reconciled with the theory we have been pursuing; that is, that the state recognizes that it is not the absolute owner of the fund, and accordingly recognizes it will not be the owner of the building; hence it proposes to pay rent. In this connection it is deserving of notice that the act does not direct that the building shall be erected on land owned by the state.

17, 18. The foregoing analysis of the act appeals to us as reasonable and just. The law is well settled that when an act is susceptible to more than one construction, one of which renders it invalid as violative of constitutional inhibitions while the other is in accord with the Constitution, the latter shall be preferred, provided it does no violence to reason or justice. Likewise all courts are agreed that proof of an acts's invalidity by reason of its conflict with the Constitution, must be highly persuasive. None of our number agrees with the construction placed upon the act by counsel for plaintiffs. Of all the interpreta-

tions which may be placed upon it, only that placed upon the act by the plaintiffs renders it invalid.

We reject this interpretation as not being in accordance with our views. It therefore becomes a matter of no consequence to write anything further. We find the act valid.

It follows that the case is reversed on rehearing.

REVERSED ON REHEARING.

McBRIDE, BELT and COSHOW, JJ., concur.

BROWN, J., Dissenting.—Section 7, Article XI, of the Oregon Constitution, prohibits the creation, in any manner, of a voluntary indebtedness by the state in excess of $50,000. Chapter 322, General Laws of Oregon, 1927, provides for the construction of an "office building for the State of Oregon," to cost not more than $600,000. By this suit, the validity of that act is challenged. For a copy of the act, together with a full statement of the cause, see the former opinions of this court handed down on July 12, 1927 (124 Or. 105, 258 Pac. 193, 204).

It is our theory of government that sovereignty resides in the people; that all governmental power flows from them; and that all officials are but the agents of the people, from whom all authority issues. For their own protection, the people of the State of Oregon framed and adopted their fundamental law, couched in plain, clear, concise language that is easily understood. The particular provision of that law involved in this litigation reads as follows:

"The legislative assembly shall not lend the credit of the state, nor in any manner create any debt or liabilities which shall singly or in the aggregate with previous debts or liabilities, exceed the sum of $50,000." Section 7, Art. XI, Or. Const.

These words are used in their ordinary and popular sense; and we are satisfied that this provision means just what it says, and that it does not mean what it neither declares nor implies. The word "debt," as used in the Oregon Constitution, means "debt" as you, and I, and all of us understand that term.

It is a familiar canon of construction that, in the interpretation of constitutional provisions, the instrument must be so construed as to give effect to the intention of the people who adopted it, as indicated by the language therein used. In this connection, Black, in his work on Interpretation of Laws, says the intention is to be sought in the Constitution itself, and the meaning thereof to be derived from the words employed therein. As to the practice of departing from the language of the Constitution in the construction of a statute, this eminent writer says:

"Deviating from the literal sense of the words employed in a constitution is a very dangerous proceeding, and one upon which the courts may embark only under the pressure of necessity, to avoid a plain absurdity or contradiction, and their power in this respect must be exercised with very great caution." Black on Interpretation of Laws, pp. 21, 22.

In the light of the condition of the public funds of our state, we cannot concede that the carrying into effect of the provisions of Chapter 322, General Laws of Oregon, 1927, providing for the construction of "an office building for the State of Oregon," and the investment of $600,000 of the industrial accident fund therein, and the appropriation from the general fund of the sum of $60,000 annually for the repayment of that fund, with interest, does not create a "debt" or "liability" within the meaning of the constitutional provision hereinbefore noted.

The case of *Wilson, Attorney General,* v. *State Water Sup. Com.,* 84 N. J. Eq. 150 (93 Atl. 732), is squarely in point. In that case, a contract made by the State Water Supply Commission, an agency of the state, to incur an obligation in violation of paragraph 4, Section 6, Article IV, of the New Jersey Constitution, limiting the right of the state to create an indebtedness, was challenged by the attorney general. The language of the New Jersey Constitution, in so far as it relates to the inhibition involved here, is substantially the language of the Oregon Constitution. The constitutional provision of New Jersey reads:

"The legislature shall not, in any manner, create any debt or debts, liability or liabilities, of the state, which shall singly or in the aggregate with any previous debts or liabilities at any time exceed $100,000; except. * * ."

In the New Jersey case, it was contended by the Water Supply Commission, as in the case at bar it was argued, that the word "debt," as used in the Constitution, should be pared to fit the occasion, and that- it did not prohibit the creation of a mortgage debt. On that point the New Jersey court, in an able and exhaustive opinion, said:

"A mortgage debt is clearly within the language of the Constitution, for the simple reason that the language there used is broad enough to cover *every manner of debt;* a debt created 'in any manner' is the unqualified constitutional description. The only question is whether we shall pare this language down and say that it means only this sort of debt or only that sort. The principal attempt in this direction is to limit the word 'debt' to actionable debts, i. e., to those the payment of which is enforceable. For such a limitation there is not the slightest justification either in common usage or in the context. Common usage

reflects common experience, which teaches us that the vast majority of debts are paid without any reference to their enforceable character. Why, therefore, should the exceptional case be singled out as illustrative of common usage in order to give to a word the sense in which it is most infrequently used? * *

"Another attempt to pare down the constitutional language is based upon the argument that a debt that is to be collected from a particular fund, or that is to be made out of a particular piece of land, is for that reason not a debt, an illogical argument that carries with it its own refutation. As a matter of common usage, no term is more familiar than 'mortgage debt.'

"If the context be regarded, we find that it not only gives no support to these limitations, but, on the contrary, distinctly refutes them, for in the context 'debt' is connected with 'state' and 'legislature,' neither of which is amenable to that enforcement of debt to which it is sought to limit the meaning of that word. But the context goes further than this, in a most significant direction, when we consider that the only manner in which the legislature pays a debt is by the making of an appropriation. Regard for the context, therefore, must at least constrain us not to deny to the word 'debt' its ordinary meaning merely because it is payable by a legislative appropriation. It is at least a reasonable construction that what the framers were guarding against were not suits and actions against the legislature, which they knew could not be brought, but debts incurred by the legislature, which they knew might be paid by appropriations if they were permitted to be contracted."

Like the Constitution of New Jersey, our Constitution contains a mandatory provision reading:

"The legislative assembly shall not * * in any manner create any debt * * which shall * * exceed the sum of $50,000." Section 7, Art. I, Or. Const.

Could language be plainer? In obedience to the provisions of the act assailed, it is the purpose of the

authorities of the state to construct, upon state land, "an office building for the State of Oregon," to cost not more than $600,000, with moneys belonging to the industrial accident fund, and to repay the funds thus used, with interest, at the rate of $60,000 per annum. That fund is a trust fund; and the building constructed therewith will be "an office building for the State of Oregon." Now, as to the question of a debt, note the following:

"Section 6. There is hereby appropriated from the general fund semi-annually, beginning with July, 1927, the sum of $30,000, *for repayment to the industrial accident fund.* The secretary of state shall, on the first day of July, 1927, and on the first day of January and July annually thereafter, by warrant, transfer from the general fund to the industrial accident fund the amount of the said appropriation, and same shall be applied first to the payment of the amount of the verified vouchers submitted to the secretary of state on said dates by the state treasurer pursuant to section 5 hereof, *and the remainder,* so far as may be required, *shall be applied in refunding the principal of the industrial accident fund, until the entire amount of same, including interest, shall have been repaid.*" Gen. Laws Or. 1927, Chap. 322.

If the enactment in question does not authorize the creation of an indebtedness by the State of Oregon, why does the foregoing section thereof provide for an appropriation for the repayment of principal and interest at the rate of $60,000 per annum?

Under the provisions of the act, the state board of control is authorized to borrow from the industrial accident fund "for the construction of an office building for the State of Oregon," and to invest not more than $600,000 thereof for that purpose. "Invest" means:

"To lay out (money or capital) in business with the view of obtaining an income or profit." Webster's New International Dictionary.

The title of the act is enlightening. It provides "for the construction of an office building for the State of Oregon." It further provides for "the investment of part of the industrial accident fund for that purpose," and then provides "for the security of said fund."

So we learn that the state promises to repay the funds used and pledges the office building as security therefor. Who repays but a borrower? In this connection, it is interesting to note that the state has paid into that fund the total sum of $1,007,786.57, while the employers and employees have contributed thereto about $26,000,000. That contribution was made, not as a tax for public revenue, but for the express purpose of affording a means for compensating the unfortunate workman who, while engaged in a hazardous occupation as defined by the act, sustains accidental personal injuries arising out of and in the course of his employment, or, in case of his death, for providing some recompense to the widow or orphan children or other dependents for the loss of their bread earner. No employer or workman ever contributed a dollar to that fund with any understanding that the fund would be diverted to build office buildings for the state, or would be used as public revenue.

Let us now go back to the "investment" of that fund, as defined by Webster. There was no thought in the legislative mind to misappropriate these funds that were held in trust by the state. The purpose of the legislature was to borrow the funds for its proprietary uses, and it undertook to provide for the repayment of the obligation by appropriating $60,000

annually therefor.   Thus the act recognizes the existence of creditor and debtor, and expressly promises to repay the debt thereby created.

Now, with the certain knowledge that a promise to repay the money used creates an obligation of the state not permitted by the Constitution, it is asserted, in effect, by some who have undertaken to construe this act, that it consists of a tissue of words, and that it does not mean what it says it means.   This statute is clothed in plain, ordinary language, and it ought not to be construed away.   We freely concede that the activities of the state have outgrown its buildings. That, however, is no argument for the creation of a debt that is not lawful.   The opinions written by my learned associates, Mr. Justice COSHOW and Mr. Justice ROSSMAN, alike argue that the office building is highly desirable, and assert that it will be paid for largely by revenue arising from the rentals thereof.   Where do the bureaus derive the money to be expended in rental?   It is the property of the state, arising from taxation, direct or indirect.

This court is barred from entering upon the domain of legislation.   It is our province only to construe the law as it now exists.   We are mindful of the fact that all reasonable doubts must be construed in favor of the validity of the statute questioned.   We are also mindful that it is the high and solemn duty of the court to protect the fundamental law from violation. Before entering upon our judicial duties, we took the oath provided by that law, to support the Constitution of the United States and the Constitution of the State of Oregon.   When we wrote our former opinion we believed, and we still believe, it proper to assume that the constitutional provision limiting, with certain exceptions, the voluntary indebtedness of our

state to the sum of $50,000 demands respect and obedience, and that it should be consistently enforced. Without qualification, we hold that the positive restraints embodied in our Constitution, the safeguard of the people, for their protection and common welfare, should not be defeated by evasion or construction.

We regret to differ from our brothers, but we cannot follow their reasoning. We are firmly of the opinion that our former determination of this cause is sustained by the fundamental law of this commonwealth, and that determination should not be disturbed.

RAND, C. J., and BEAN, J., concur.