# IN THE OREGON TAX COURT

Mary Diane SAVAGE,
David H. Craig, Earl D. McGinty, Judy McGinty
Richard D. Smith and Lawrence F. Lear

*v.*

Richard A. MUNN
and Department of Revenue,

Don McINTIRE
and Thomas P. Dennehy,
*Intervenors,*

Henry KANE,
*Intervenor*

(TC 3075)

Duane A. Bosworth, Davis Wright Tremaine, Portland, represented plaintiffs.

Joseph Laronge, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for defendants rendered March 13, 1992.

## CARL N. BYERS, Judge.

This matter is before the court on cross-motions for summary judgment. Plaintiffs are property owners seeking a declaratory judgment under ORS chapter 28 regarding Article XI, section 11b(4), of the Oregon Constitution. Plaintiffs and defendants have stipulated the facts. Intervenors have not joined in that stipulation but also have not objected or sought to introduce additional evidence.[1]

In their amended complaint, plaintiffs claim Article XI, section 11b(4), violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. However, the court finds it necessary to consider the preliminary issue of jurisdiction before reaching that claim.

## TAX COURT JURISDICTION

ORS 305.410(1) provides that this court has "exclusive" jurisdiction over "all questions of law and fact arising under the tax laws of this state." Under that statute, this court has jurisdiction to determine the validity of any tax statute enacted by the Oregon legislature. Although Article XI, section 11b, is part of Oregon's Constitution, it is a law of the state which, by its content and objective, is a tax law. The

---

[1] Intervenor Kane contends that plaintiffs do not have standing to sue and the facts are insufficient to present a justiciable issue. The court finds to the contrary.

court finds it has jurisdiction to hear any challenge to the validity of Article XI, section 11b.[2]

■ As a general rule, taxpayers must exhaust their administrative remedies before appealing to this court. ORS 305.275(4). This is true even for challenges to the constitutionality of tax assessments. *Dennehy v. Dept. of Rev.*, 295 Or 574, 668 P2d 1210 (1983). However, there must be an administrative remedy to exhaust. In this case, there is none.

■ Plaintiffs directly challenge the validity of a provision of the Oregon Constitution. No statutory administrative remedy is provided for such a challenge.[3] There is no administrative action being challenged. Plaintiffs claim a violation of federal law, which cannot be affected or changed by administrative review. As an administrative agency, the department is not authorized to rule on whether Article XI, section 11b(4), of the Oregon Constitution violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *State of Wash. ex rel. Eikenberry v. Dept. of Rev.*, No. 2134, slip order at 7 (Or Tax June 4, 1985).

## BACKGROUND EXPLANATION

Before examining the issue in this case, it is necessary to briefly describe Oregon's property tax system and how Article XI, section 11b(4), impacts that system.

Property taxes are imposed by units of local government (taxing units) and assessed against property according to value (ad valorem). Every county, city, school district, fire district, irrigation district, mosquito abatement district, port, or other special district is a separate taxing unit.[4] Before levying a tax, each taxing unit must first engage in a budgeting process.

---

[2] The legislature has provided exclusive remedies for determining the effect of the limits of Article XI, section 11b, on taxes. *See* ORS 305.580(1). However, those remedies do not apply to a suit which challenges the validity of Article XI, section 11b. Those remedies only pertain to suits which assume section 11b is valid and, therefore, determines its effect on taxes.

[3] While the Department of Revenue can issue declaratory rulings, it does so only with respect to the applicability of "any rule or statute enforceable by it." ORS 305.105.

[4] Some special districts may not impose taxes. It is also possible that some special districts are not "governmental units" as used in Article XI, section 11b. *See, for example, Comeaux v. Water Wonderland Improvement Dist.*, 12 OTR 132 (1992), *aff'd* 315 Or 562, 847 P2d 841 (1993).

With public participation, the budgeting process estimates the resources and expected costs for government services. The taxing unit then levies a tax to pay for those services. ORS 310.060.

To determine the tax for each property, the county assessor divides the total tax levy of a taxing unit by the total assessed value of taxable property within that taxing unit's territory. ORS 310.090. This results in a tax rate. For example, a tax levy of $25,000 for a taxing unit having $10,000,000 worth of taxable assessed value would result in a tax rate of .0025. Applying that rate to a house with an assessed value of $55,000 produces a tax of $137.50.

There are many taxing units with overlapping boundaries. A school district's boundaries may overlap a city, a rural fire protection district and a community college area. Of course, the school district is within a county, which is also a taxing unit.[5]

Property taxes are administered at the county level. Within each county are a number of separate taxing units, all levying property taxes for their own budgets. The county assessor is required to keep track of all the different tax levies and the properties subject to each levy. That is not a simple task. A property on one side of a road may be subject to five different tax levies, including a county, a city, a school district, a community college and a park levy. A property just across the road may be subject to only three tax levies such as a county, a school district and an irrigation district. To account for all of these levies, the assessor uses tax code areas.[6] All taxable property in a single tax code area is subject

---

[5] School districts and other taxing units may also extend across county boundaries, further complicating administration of the tax system.

[6] ORS 308.221 provides:

"Each year, the county assessor shall establish a system of code areas, identified by code numbers, which shall represent all of the various combinations of taxing agencies as of July 1 of that year in which a piece of property was located in the county. The assessor shall compute a consolidated rate percent of levy for each code area and shall indicate on the assessment roll the code area number for each item of property assessed. In addition, the assessor shall compile in duplicate a list of all code areas and their numbers and identify for each area the names of each taxing agency in the area, the rate percent of levy of each agency and by category as described in ORS 310.150, the consolidated rate for the area. The list shall constitute a part of the certificate prepared under ORS 311.105, to be delivered to the county clerk and to the tax collector."

to the same tax levies. Properties of equal value and in the same code area will pay the same amount of taxes. Properties of equal value but located in different code areas may pay different amounts of taxes because they will be subject to different levies. Thus, property taxes are not uniform between code areas.

## ARTICLE XI, SECTION 11b

Article XI, section 11b, of the Oregon Constitution was an initiative measure (Measure 5) adopted by the people at general election in November, 1990. That law limits the total amount of property taxes that can be imposed for public schools and government operations other than schools. Article XI, section 11b(1), sets forth the following schedule:

"MAXIMUM ALLOWABLE TAXES

For Each $1,000.00 of Property's Real Market Value

| Fiscal Year | School System | Other than Schools |
|---|---|---|
| 1991-1992 | $15.00 | $10.00 |
| 1992-1993 | $12.50 | $10.00 |
| 1993-1994 | $10.00 | $10.00 |
| 1994-1995 | $ 7.50 | $10.00 |
| 1995-1996 | $ 5.00 | $10.00 |
| and thereafter" | | |

As can be seen, the maximum amount of tax that can be imposed on a property for the 1991-92 fiscal year is $25 per $1,000 of real market value.

The measure recognized that some adjustment would have to be made for properties subject to the tax levies of several taxing units. Consequently, Article XI, section 11b(4), provides:

"In the event that taxes authorized by any provision of this Constitution to be imposed upon any property should exceed the limitation imposed on either category of taxing units defined in subsection (1) of this section, then, *notwithstanding any other provision of this Constitution*, the taxes imposed upon such property by the taxing units in that category shall be reduced evenly by the percentage necessary to meet the limitation for that category. The percentages used to reduce the taxes imposed shall be calculated separately for each category and may vary from property to property within the same taxing unit. The limitation

imposed by this section shall not affect the tax base of a taxing unit." (Emphasis added.)

## ISSUE

Does the above-quoted subsection (4) violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution?

## EFFECT OF SUBSECTION (4)

■    Plaintiffs' claim can be best understood by examining the effect of subsection (4) on property taxes. Where the total taxes imposed by all of the tax levies in a code area exceed the constitutional limit, subsection (4) requires the levies *in that code area* to be reduced proportionately.[7] Each of the levies is compressed or reduced in the percentage that each levy represents to all the levies in that code area.

Although this does not destroy uniformity within a tax code area, it destroys uniformity of the tax rate within a taxing unit. For example, a property in a city also pays taxes to the county. If the tax levies in that property's code area exceed the constitutional limits, all the levies are compressed. As a result, the city property will pay county taxes at a lesser rate than a property outside the city whose county tax rate is not subject to compression.

Plaintiffs relate this effect to the actual tax statements submitted as exhibits. Plaintiffs state:

"Property A is located in the City of Condon, Tax Code Area 1. Voters there have imposed upon themselves total non-school taxes of $21.93 per $1,000 of value. Measure 5 requires that these property owners' self-imposed taxes be reduced to a total of $10 per $1,000 of value. As Exhibit E shows, Measure 5's proration requires that each taxing authority's tax be reduced by 54.4 percent. Before Measure 5, Property A was taxed by Gilliam County at a rate of $4.7194 per $1,000, or $471.94 on a property of $100,000. Measure 5's mechanism reduces Property A's effective county tax rate

---

[7] Subsection (4) does not mention code areas, but under the present system the required reduction takes place at that level.

to \$2.1520 per \$1,000, or \$215.20 on a \$100,000 property; only \$215.20 can be collected from Property A.

"Property B, on the other hand, is located in Tax Code Area 7, in rural Gilliam County, and not in Condon or Arlington. The voters there have not imposed any non-school taxes on themselves, other than a port district and county taxes. Those two levies total \$4.8469 per \$1,000 of value, beneath Measure 5's \$10.00 cap. Property B has no Measure 5 reduction. As a result, Property B pays the full county tax levy, \$4.7194 per \$1,000, or \$471.94 on a \$100,000 property.

"Within a single taxing authority, Gilliam County, Property A pays \$215.20 to support county government, while Property B, with an identically-assessed value, pays \$471.94 to the same county. Property B pays \$256.74 more to the same taxing authority than the identical Property A, or more than *twice* what Property A pays."

## POSTURE OF SUBSECTION (4)

■ ■ Subsection (4) is a state constitutional provision. Significantly, it expressly overrides other provisions of the Oregon Constitution with the statement "notwithstanding any other provision of this Constitution." The parties agree that this language gives subsection (4) priority over other provisions of the Oregon Constitution. For example, there is no question that compression of taxes under subsection (4) destroys the territorial uniformity required by Article I, section 32. However, since subsection (4) requires compression and it prevails over Article I, section 32, lack of territorial uniformity is tolerated to the extent it is caused by subsection (4).

The "notwithstanding" language in subsection (4) also affects the court's analysis of the claims before it. Normally, the "proper sequence" for a state court is to analyze state law before deciding federal law. *Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1980). However, here the court must move directly to consideration of plaintiffs' claims under the Fourteenth Amendment.

## LIMITS OF JUDICIAL REVIEW

■ ■ Inherent in our three branches of government is the potential for conflict and disagreement. The success of our "grand experiment" is due in part to the great deference each

branch of government grants the other. This deference is a fundamental premise in a court's review of legislation. A court is duty bound to adopt that construction or interpretation of legislation that avoids conflicts with the constitution or would result in it being held invalid. *Fox v. Galloway*, 174 Or 339, 348, 148 P2d 922 (1944). The court is to "resolve all doubts in favor of * * * constitutionality," *Eastern & Western Lumber Co. v. Patterson*, 124 Or 112, 119, 258 P 193, 264 P 441 (1928), and "[e]very intendment must be given in favor of its validity." *Cook v. Port of Portland*, 20 Or 580, 582, 27 P 263 (1891). This mandate to uphold the law, if at all possible, applies to legislation enacted by the people through the initiative as well as to enactments of the Legislative Assembly. *Anthony v. Veatch*, 189 Or 462, 220 P2d 493, 221 P2d 575 (1950).

■ The same rule of deference applies in determining whether state law is in conflict with the United States Constitution.

"A state legislature, in the enactment of laws, has the widest possible latitude within the limits of the Constitution. * * * Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function." *Carmichael v. S. Coal & Coke Co.*, 301 US 495, 510, 57 S Ct 868, 81 L Ed 1245 (1937).

## EQUAL PROTECTION CLAUSE

The relevant portion of the Fourteenth Amendment to the United States Constitution states:

"No State shall * * * deny to any person within its jurisdiction the equal protection of the laws."

The simple notion that people are entitled to equal treatment under the law is not so simple in application.[8] In a sense, the concept has content only as it is applied to specific factual circumstances.[9] It is the nature of government to make laws that distinguish between people based on their

---

[8] Professor Tribe distinguishes between the "right to equal treatment" and the "right to treatment as an equal." Laurence H. Tribe, *American Constitutional Law,* § 16-1, at 1437-38 (2d ed 1988).

[9] *See, for example,* Peter Westen, *The Empty Idea of Equality*, 95 Harv L Rev 537 (1982).

differences. These differences encompass virtually every aspect of life, including age, income, occupation, or even whether a person uses a wood stove (ORS 468A.460).

■■ A court's duty is to determine whether such classifications are consistent with constitutional standards. In cases claiming a breach of equal protection, the courts examine the classification to see if it impinges on values or goals protected by the Constitution. The United States Supreme Court ("Supreme Court") has determined that some values or goals require greater protection than others. Thus, laws dealing with "suspect" classifications, such as race, are subject to "strict scrutiny" by the court. On a lesser level, laws that regulate fundamental or protected interests, such as the right to vote, must show a "compelling interest" for regulating that activity. The lowest level of review is given to laws that deal with lesser interests, such as economic matters. State laws in this area are upheld as long as they are " 'rationally related to furthering a legitimate state interest.' "[10] *Vance v. Bradley*, 440 US 93, 97, 99 S Ct 939, 59 L Ed 2d 171 (1979) (quoting *Massachusetts Bd. of Retirement v. Murgia*, 427 US 307, 96 S Ct 2562, 49 L Ed 2d 520 (1976)).

The states have sovereign powers to impose taxes on their citizens. In commenting on the fact that those powers are subject to the Equal Protection Clause, the Supreme Court has stated:

> "But that clause imposes no iron rule of equality, prohibiting the flexibility and variety that are appropriate to reasonable schemes of state taxation. The State may impose different specific taxes upon different trades and professions and may vary the rate of excise upon various products. It is not required to resort to close distinctions or to maintain a precise, scientific uniformity with reference to composition, use or value." *Allied Stores of Ohio Inc. v. Bowers*, 358 US 522, 526-27, 79 S Ct 437, 3 L Ed 2d 480 (1959).

■ Likewise, the Supreme Court has indicated that state taxation is one of those areas where the greatest deference to legislative judgment is given.

---

[10] Or, phrased differently, the court stated: "Thus, we will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Vance v. Bradley*, 440 US 93, 97, 99 S Ct 939, 59 L Ed 2d 171 (1979).

"Where taxation is concerned and no specific federal right, apart from equal protection, is imperiled, the states have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation." *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 US 356, 359, 93 S Ct 1001, 35 L Ed 2d 351 (1973) (footnote omitted).

Although states may treat classes of persons or property differently, the criteria used for those classes cannot be "wholly unrelated to the objective of th[e] statute." *Eisenstadt v. Baird*, 405 US 438, 447, 92 S Ct 1029, 31 L Ed 2d 349 (1972). The Equal Protection Clause does not preclude the state from imposing different rates of taxes on different classes.

"This court has repeatedly held that inequalities which result from a singling out of one particular class for taxation or exemption, infringe on no constitutional limitation." *Carmichael v. S. Coal & Coke Co.*, 301 US 495, 509, 57 S Ct 868, 81 L Ed 1245 (1937).

In considering Supreme Court cases on state taxation, we must avoid reliance on those which ruled on state uniformity requirements rather than equal protection.

"Equally irrelevant are those cases in which this Court, because of the nature of the litigation, was construing the uniformity clause of a state constitution, and was not applying the Fourteenth Amendment. This Court has previously had occasion to advert to the narrow and sometimes cramping provision of these state uniformity clauses, and has left no doubt that their inflexible restrictions upon the taxing powers of the state were not to be insinuated into that meritorious conception of equality which alone the Equal Protection Clause was designed to assure. *See Puget Sound Co. v. King County* [sic], 264 US 22, 27." *Nashville C. & St. L. Ry. v. Browning*, 310 US 362, 368, 60 S Ct 968, 84 L Ed 1254 (1940) (citations omitted).

When we follow the direction to "*see Puget Sound Co. v. King County*" we find this statement:

"The theoretical operation of a tax is often very different from its practical incidence, due to the weakness of human nature and anxiety to escape tax burdens. This justifies the legislature, where the constitution does not forbid, in adopting variant provisions as to the rate, the assessment and the

collection for different kinds of property. The reports of this Court are full of cases which demonstrate that the Fourteenth Amendment was not intended, and is not to be construed, as having any such object as the stiff and unyielding requirements of equality in state constitutions." *Puget Sound Power & Light Co. v. County of King*, 264 US 22, 28, 44 S Ct 261, 68 L Ed 541 (1924).

## APPLCIATION OF SUPREME COURT CRITERIA

■ The objective of the legislation in question, Article XI, section 11b, was to limit the total taxes that could be levied on property. That objective is a legitimate state interest. There can be no doubt that taxes imposed by authority of the state are subject to state control. Even where local taxing units may be granted specific powers by the Oregon Constitution, they are subject to the sweeping language "notwithstanding any other provision of this Constitution." This language gives subsection(4) precedence over *all* other state constitutional provisions which might conflict with it.

■ One difficulty in applying Supreme Court decisions in this instance is the lack of a typical "classification." Typical state taxing statutes, particularly ad valorem tax statutes, distinguish between kinds of property like agricultural and commercial. In this instance the classification is between those whose total property taxes exceed a dollar amount and those who do not. Subsection (4) reduces the rate of tax for certain taxpayers in certain code areas. Another way to look at it is to say Measure 5 grants an exemption for all taxes in excess of the limits (*i.e.,* $25 per $1,000 of value in 1991-92).

Defendants argue that subsection (4) does not affect either the levy or the collection of taxes. Defendants believe it affects only the distribution of taxes and, therefore, does not support an equal protection claim. Defendants ignore reality. If subsection (4) affected only distribution it would not be individual taxpayers complaining but the affected taxing units who receive less taxes. The effect of subsection (4) is to reduce the amount of taxes imposed on a property. It does not matter whether it is a reduction in amount or in rate, the result is the same.[11]

---

[11] For example, Exhibit B, page 1, of the stipulation is a property tax statement. The statement shows that the tax rate for the Elementary Education Service District for Clackamas County is .6047 per $1,000. When this rate is applied to an assessed value of $69,400, it results in a tax of $41.97. However, when the constitutional tax

Does the classification have any rational relationship to the objective of Article XI, section 11b? Of course it does, since it directly accomplishes the objective of the statute by limiting the taxes that can be imposed. The legislative body, in this case the people, has determined that taxes in excess of $25 per $1,000 of assessed value for the year 1991-92 are detrimental and should not be allowed.[12] To limit taxes, it has chosen to reduce each taxing unit's levy by a proportionate amount in each case where the levies would otherwise exceed the limit. It is true this limitation could have been accomplished by other means. The people could have limited the amount of assessed value subject to taxation or provided for equalization throughout the entire state. However, such alternatives are irrelevant.

> "It is immaterial that available alternatives may be better suited to carrying out the rationale underlying the statute." *School Dist. No. 12 v. Wasco County*, 270 Or 622, 629, 529 P2d 386 (1974).

The choice of the dollar amount to impose as a limit, like any other tax rate set by a legislature, is a value judgment based upon a variety of factors.

> "Lawmakers have broad freedom to classify the subjects of taxation both for purposes of the imposition and of the *rate* of tax." *Tharalson v. State Dept. of Rev.*, 281 Or 9, 16, 573 P2d 298 (1978) (emphasis added); see also *Louisville Gas & Elec. Co. v. Coleman*, 277 US 32, 37, 48 S Ct 423, 72 L Ed 770 (1928).

---

limit is applied, the total tax is only $28.09. This is the equivalent of a tax rate of .4048 per $1,000.

[12] Property taxes can exceed the scheduled limits because subsection (3) provides:

"(3) The limitations of subsection (1) of this section apply to all taxes imposed on property or property ownership except

"(a) Taxes imposed to pay the principal and interest on bonded indebtedness authorized by a specific provision of this Constitution.

"(b) Taxes imposed to pay the principal and interest on bonded indebtedness incurred or to be incurred for capital construction or improvements, provided the bonds are offered as general obligations of the issuing governmental unit and provided further that either the bonds were issued not later than November 6, 1990, or the question of the issuance of the specific bonds has been approved by the electors of the issuing governmental unit." Or Const, Art XI, § 11b(3).

The criteria used by the people in determining the class, *i.e.,* total tax levies, is not a suspect classification. Property taxes only roughly correlate with the ability to pay. Limiting the total tax in relation to the value of property is a reasonable and nondiscriminatory method.

Possibly those who voted in favor of Measure 5 also believe there is a rough correlation between taxes imposed and benefits received. A property located in a city pays city taxes to maintain city streets which benefit primarily the city property. Under subsection (4), a city property will pay less taxes to the county than the rural property. However, since it is the county that maintains the rural property's road, there is some relationship between the taxes paid and the benefits received.

■ The classification used here is not between taxpayers. As indicated above, it is not like selecting farmland for special assessment or determining that property used in some particular industry should be exempt. The classification is only the fixing of a maximum tax rate. Just as the legislature can impose income taxes at different rates, it can also tax property at different rates.

■ It is important to emphasize that this scheme lacks uniformity only within the boundaries of an individual taxing unit. That is, properties of identical value within the same taxing unit may pay different rates of tax to that taxing unit. Within the taxing unit, the classification results in unequal treatment. However, the classification is not made by the local taxing unit. The classification is made by the state and limits the total amount of taxes that can be imposed on property. Consequently, the classification operates uniformly throughout the state.

■ Plaintiffs cite the case of *Allegheny Pittsburgh Coal Co. v. County Commission,* 488 US 336, 109 S Ct 633, 102 L Ed 2d 688 (1989), in support of their position. *Allegheny,* and cases like it, such as *Cumberland Coal Co. v. Board of Revision,* 284 US 23, 52 S Ct 48, 76 L Ed 146 (1931), are not, in this court's opinion, to be confused with cases involving legislative classification. The action complained of in *Allegheny* was unequal treatment in the administration of a state's tax laws. In such cases the Equal Protection Clause

requires uniformity or equal treatment under those laws. Even then, courts will not interfere except in cases of systematic discrimination that amount to an "intentional violation of the essential principle of practical uniformity." *Sunday Lake Iron Co. v. Township of Wakefield*, 247 US 350, 353, 38 S Ct 495, 62 L Ed 1154 (1918). There is a significant difference between unequal treatment by administrators of state tax laws, and legislation which treats people unequally. It is clear that the courts give great deference and wide latitude to legislative classifications.[13]

The parties also cite *Allied Stores*. This court believes its conclusion is consistent with that case.[14]

Plaintiffs' most persuasive argument is that subsection (4) allows some property owners to shift the burden of government to others. Plaintiffs aptly illustrate this point by the following example:

"The 1991-1992 Oregon Blue Book says that 1,750 people live in Gilliam County, with 700 people living in Condon, 455 in Arlington, and approximately 595 elsewhere in the county. Taking a look at a chart like Exhibits E or H, the people of Condon and Arlington could rightly decide that their city governments suffered a tremendous cut from Measure 5, which needed to be addressed. They could vote for themselves a substantially higher tax base for their cities. This would have the effect of capturing a larger portion of Measure 5's $10.00 'pie' for non-school taxes, would raise more money for their cities without costing them a penny, and would further *lower* the effective county tax rate that city residents will pay, increasing the discrimination between them and other county residents, and further shifting the

---

[13] If *Allegheny* had been the result of state legislation which was consistent with its state constitution, one might ponder whether the Supreme Court would have reached the same result. *See, for example*, William Cohen, *State Law in Equality Clothing: A Comment on Allegheny Pittsburgh Coal Company v. County Commission*, 38 UCLA L Rev 87 (1990).

[14] As a matter of passing interest, the concurring opinion of Justice Brennan, in reconciling the majority's holding with a conflicting case, *Wheeling Steel Corp. v. Glander*, 337 US 562, 69 S Ct 1291, 93 L Ed 1544 (1949), brings out a salient point: That the federal court is concerned with protecting federalism and that such interests constitute a backdrop for all of its decisions. The Supreme Court may well condemn taxation which contradicts federalism, by discriminating against those outside a state, and yet uphold the same type of classification if it "presents no state action disruptive of the federal pattern." *Allied Stores of Ohio v. Bowers*, 358 US 522, 533, 79 S Ct 437, 3 L Ed 2d 480 (1959).

burden of support for county government onto the remaining county residents. There is nothing that voters such as plaintiff Lear or the owner of property B can do to even influence this shifting burden within a tax authority. Under Measure 5, the burden of supporting the county government will be shifted to their properties by a vote of someone else, the voters of Condon and Arlington. Because of Measure 5's proration mechanism, the taxes of property owners like plaintiff Lear will become even more non-uniform, through a vote in which they cannot even participate."

However, this same type of claim was considered and denied in *Jarvill v. City of Eugene*, 289 Or 157, 613 P2d 1 (1980). There the Oregon Supreme Court upheld a charter amendment that created a downtown district and authorized taxes on that district only. The city council then enacted ordinances imposing taxes. In upholding the taxes against claims of nonuniformity under Article I, section 32, of the Oregon Constitution, the court said "nor does it deny anyone the equal protection of the laws guaranteed by the Fourteenth Amendment." *Id.* at 184.

The dissent of Justice Peterson in that case does point out, just as plaintiffs complain here, that the majority can impose a tax on a minority which will, in essence, benefit the entire taxing unit. *Id.* at 197. However, the majority has long been permitted in this country to take from the rich and give to the poor, to tax businesses differently than individuals, to exempt some property and tax others, and to pay some farmers not to grow crops and to pay others to grow crops.

## CONCLUSION

Plaintiffs' claim is without merit. The legislative power of the state in matters of taxation is entitled to great deference by the courts. If there is a rational relationship between the classification made and a legitimate state objective, the court must uphold the legislation. Limiting property taxes is unquestionably an appropriate state objective. Compressing the tax rates to achieve that limitation is a reasonable means of accomplishing the law's objective. The law does not discriminate against those who pay less than the maximum allowable amount of taxes. Those taxpayers may pay a greater proportionate share to a particular taxing unit but *overall* they are not treated unequally. Now therefore,

IT IS ORDERED that plaintiffs' Motion for Summary Judgment is denied and,

IT IS FURTHER ORDERED that defendants' and Intervenors' Motions for Summary Judgment are granted. No costs allowed.